*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 12-CO-1362, 12-CO-1538, 12-CO-1539,
12-CO-1540, 12-CO-1541, 12-CO-1542, & 12-CO-1543

CHARLES S. TURNER,
CHRISTOPHER D. TURNER,
RUSSELL L. OVERTON,
LEVY ROUSE,
CLIFTON E. YARBOROUGH,
KELVIN D. SMITH,
&
TIMOTHY CATLETT,

APPELLANTS,

V.

UNITED STATES,

APPELLEE.

Appeals from the Superior Court
of the District of Columbia

(FEL-8615-84, FEL-8513-84, FEL-8612-84, FEL-8613-84,
FEL-8614-84, FEL-8616-84, & FEL-8617-84)

(Hon. Frederick H. Weisberg, Motions Judge)

(Argued April 29, 2014                    Decided June 11, 2015)

*John S. Williams*, with whom *Robert M. Cary, Cadence Mertz, Jennifer M. Sasso*, and *Frances Y. Walters* were on the brief, for appellant Clifton Yarborough.

*Kevin D. Feder*, with whom *Michael E. Antalics*, *Joana Nairn*, and *Meredith Garagiola* were on the brief, for appellant Russell L. Overton.

*Jennifer Wicks* was on the brief for appellant Charles Turner.

*Shawn Armbrust*, *Barry J. Pollack*, *Michael B. Bernstein*, and *Justin P. Hedge* were on the brief for appellant Christopher Turner.

*Veronice A. Holt* was on the brief for appellant Levy Rouse.

*Donald P. Salzman* was on the brief for appellant Kelvin D. Smith.

*Cory Lee Carlyle* was on the brief for appellant Timothy Catlett.

*Nicholas P. Coleman*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, *James Sweeney*, *Kacie Weston*, and *Colleen Kennedy*, Assistant United States Attorneys, were on the brief for appellee.

*Robert B. Humphreys* and *Steven Schulman* filed a brief on behalf of The Innocence Network as *amicus curiae* in support of appellants.

*Stephen P. Braga* filed a brief on behalf of The National Association of Criminal Defense Lawyers as *amicus curiae* in support of appellants.

*John C. O'Quinn*, *Savaria B. Harris*, *Traci M. Braun*, *Deborah S. Decker*, and *Michael B. Potere* filed a brief on behalf of False Confessor Exonerees as *amicus curiae* in support of appellants.

*Julia M. Jordan*, *Lee Ann Anderson McCall*, and *Elizabeth A. Cassady* filed a brief on behalf of  Former Judges and Prosecutors as *amicus curiae* in support of appellants.

*Aderson Bellegarde François* filed a brief on behalf of Howard University School of Law Criminal Justice Clinic & Civil Rights Clinic as *amicus curiae* in support of appellants.

*Douglas Baruch*, *Jessica P. Neiterman*, and *Sujata Jhaveri* filed a brief on behalf of Former Law Enforcement Officers as *amicus curiae* in support of appellants.

Before GLICKMAN and BLACKBURNE-RIGSBY, *Associate Judges*, and NEBEKER, *Senior Judge*.

GLICKMAN, *Associate Judge*: In 1985, appellants were tried and convicted for the kidnapping, armed robbery, and first-degree felony murder while armed of Catherine Fuller on October 1, 1984. This court affirmed their convictions on direct appeal. Some twenty-five years later, appellants returned to Superior Court with motions to vacate their convictions pursuant to D.C. Code § 23-110 (2012 Repl.) and the Innocence Protection Act ("IPA"), D.C. Code § 22-4135 (2012 Repl.). Appellants claimed that they did not receive a fair trial because the government withheld exculpatory and impeachment evidence in violation of its obligations under *Brady v. Maryland*,[1] and that newly discovered evidence, including witness recantations, established their actual innocence of the crimes against Mrs. Fuller. Appellant Yarborough additionally claimed that his trial counsel was constitutionally ineffective in failing to investigate his intellectual disabilities as grounds for suppressing the videotaped statement he made when he was arrested, which the government used against him at trial.

---

[1] 373 U.S. 83 (1963).

Appellants' motions were assigned to the Honorable Frederick H. Weisberg. He presided over a three-week evidentiary hearing on their claims in mid-2012. Judge Weisberg thereafter denied the motions in a written order. Before us now are the appeals from that decision.

We affirm. As we shall explain, we conclude that appellants' *Brady* claims fail because appellants have not shown a reasonable probability that the outcome of their trial would have been different had the government disclosed the withheld evidence in timely fashion. Appellants' IPA claims fail because the motions judge found the witness recantations to be incredible and appellants therefore have not established their actual innocence by a preponderance of the evidence. Finally, we reject Yarborough's ineffective assistance claim because he has not shown that he was prejudiced by his trial counsel's allegedly deficient performance.

**Table of Contents**

I. The Murder of Catherine Fuller and Appellants' 1985 Trial................ 5
   A. The Government's Case at Trial......................................... 6
   B. The Defendants' Alibis and the Government's Rebuttal................11
   C. Verdicts and Direct Appeal ...........................................13
II. Appellants' Post-Conviction Motions: *Brady* and IPA Claims ...........15
   A. Witness Recantation.................................................15
      1. Calvin Alston and Harry Bennett....................................15
      1. Melvin Montgomery and Linda Jacob .............................19
   B. Evidence Not Disclosed to the Defense................................20
      1. Undisclosed Alternative-Perpetrator Evidence ......................20

      a. The Witness in the Alley…………………………………20
      b. James McMillan…………………………………………..21
      c. James Blue………………………………………………. 24
    2. Impeachment Evidence …………………………..……………28
  C.  Expert Testimony…………………………………………......30
  D.  The Motions Judge's Decision………………………………31
III. Analysis of Appellants' *Brady* Claims………………………………34
  A. *Brady* and the Applicable Standard of Review  …………………….......34
  B. The Witnesses in the Alley…………………………………………40
  C. James McMillan Evidence  …………………………………………41
    1. The October 1984 Robberies…………………………………42
    2. The 1992 Murder of A.M. …………………………………….46
  D.  Ammie Davis's Accusation of James Blue…………………………47
  E.  Impeachment Evidence ……………………………………………..56
  F.  Cumulative Materiality of the Undisclosed Evidence ……………..60
IV. Analysis of Appellants' IPA Claims …………………………………..68
V.  Yarborough's Claim of Ineffective Assistance of Counsel ……………76
  A.  Background ……………………………………………………77
    1. Yarborough's Statement to Police ………………………………77
    2. Yarborough's Suppression Motion …..………………………78
    3. The Hearing on Yarborough's Ineffective Assistance Claim ……80
  B.  Analysis ………………………………….…………………………86
VI.  Conclusion …………………………………………………………94

## I.  The Murder of Catherine Fuller and Appellants' 1985 Trial

Shortly after 4:30 p.m. on October 1, 1984, Catherine Fuller left her home on foot to go shopping.  Around 6:00 p.m., William Freeman, a street vendor, discovered her lifeless body lying in a garage in the middle of an alley between 8th and 9th Streets Northeast, just north of H Street.  One of the garage doors was open, enabling Freeman to catch sight of Fuller's body when he entered the alley to relieve himself.  Mrs. Fuller had been badly beaten and violently sodomized, and

had suffered massive blunt force injuries, including a ruptured liver and broken ribs. Her clothing and property were found strewn about the garage and the alley. The police were unable to find the object used to commit the sodomy or to recover any usable fingerprints or other physical evidence that could identify the perpetrators. The medical examiner could not determine from Fuller's injuries how many persons were involved in assaulting her.

After conducting more than 400 interviews, investigators developed the theory that Fuller was assaulted and killed by a large group of teenagers who initially set out, on the spur of the moment, to rob her. A total of thirteen individuals believed to have been members of that group were indicted. Two of them, Harry Bennett and Calvin Alston, pleaded guilty and agreed to testify for the government. A third defendant, James Campbell, whose case was severed for trial after his attorney became ill, eventually pleaded guilty as well. The remaining defendants—the seven appellants before us now and their co-defendants Steven Webb, Alphonzo Harris, and Felicia Ruffin—went to trial in the fall of 1985.

## A. The Government's Case at Trial

At the center of the government's case was the testimony of the two cooperating witnesses, Bennett and Alston. Bennett had pleaded guilty to

manslaughter and robbery, Alston to second-degree murder. They provided similar accounts of the events leading to Fuller's death. According to them both, they were in a group of young men, including appellants, who were gathered in a park at 8th and H Streets Northeast on the afternoon of October 1, 1984, when they observed Fuller across the street. Alston admitted being the one who, after appellant Catlett sang a song about needing money, suggested that the group rob Fuller. Members of the group split into two bodies and crossed the street to attack Fuller at the alley between 8th and 9th Streets. Bennett, Alston, and others, including appellants, punched and kicked her, hit her with a stick or board, knocked her to the ground, and robbed her of her money and jewelry. Fuller then was dragged into a garage and stripped nearly naked. As some in the group held her legs and others stood and watched, appellant Rouse took a pole or pipe-like object and shoved it into her rectum. The group then dispersed.

Although Bennett and Alston agreed on the preceding outline of events, they differed on some important matters. Notably, while Bennett testified that appellant Yarborough did not accompany the group into the alley, Alston recalled that Yarborough actively participated in kicking Fuller as she lay on the ground there. And while Bennett remembered that Alston and Webb held Fuller's legs as Rouse sodomized her, Alston thought appellants Overton and Charles Turner did so. In

addition, Bennett and Alston each had made prior inconsistent statements to the police and the grand jury regarding who was present in the park and who participated in attacking Fuller.

Four witnesses to the crime corroborated Bennett and Alston's account. Two of them, Carrie Eleby and Linda Jacobs, testified that they came upon the attack when it was already in progress. Eleby implicated appellants Catlett, Overton, Christopher Turner, Smith, and Rouse, as well as Alston and Webb. She also put appellant Yarborough in the alley, but she did not remember seeing him attack Fuller. Jacobs saw Christopher Turner and Smith in the alley. Both witnesses saw Rouse sodomize Fuller.

Eleby and Jacobs had significant credibility problems. Both were PCP users. Eleby contradicted herself, could not keep names and dates straight, and claimed she did not remember anything she had told the police or the grand jury. Jacobs, too, was a difficult witness who contradicted herself on the stand and had trouble answering questions. Moreover, each witness's account was impeached or contradicted by other testimony. For example, contrary to her testimony at trial, Eleby told police that she and Jacobs arrived at the alley only after the police and the morgue staff were there, and she told the grand jury that appellant Smith did

not hit or kick Fuller.  In addition, Eleby testified that she and Jacobs were with their friend Tawana when they heard a scream coming from the alley, turned around and saw a group attacking a woman.  But Jacobs testified they were not with Tawana and did not hear a scream.  She claimed they were prompted to enter the alley by their friend Annette Taylor.  But Taylor denied this and testified that she was nowhere near the scene at the time.

The other two eyewitnesses were Melvin Montgomery and Maurice Thomas.  Montgomery testified that he saw appellants Catlett, Charles Turner, Overton, and Rouse standing with others in the park.  Montgomery heard Catlett singing a Chuck Brown song about needing money, saw Overton point across the street at Fuller, and watched as those four appellants and others crossed the street in her direction.[2]

Fourteen-year-old Maurice Thomas testified that he passed the alley and saw a group of people surrounding a woman.  Those he saw included appellants Catlett, Yarborough, Rouse, Charles Turner, and Christopher Turner, and may have

---

[2] Montgomery, who knew each of the appellants, also saw Yarborough in the park, but not until after the assault on Fuller was over.

included appellant Smith and Harry Bennett.[3] Thomas saw Catlett pat down the woman and then place something in his pocket. Catlett then hit her and when she fell to the ground, the rest of the group assaulted her. Later that evening, Thomas heard Catlett tell someone that "we had to kill her because she spotted someone" Catlett was with.

The government put on other important evidence of appellants' guilt in its case-in-chief. First, the jury was shown a redacted videotape of Yarborough's statement to the police, in which he placed himself in the park, the alley, and the garage before and during the attack on Fuller. (The statement was admitted only against Yarborough.)

Second, Kaye Porter testified that she had asked Catlett about the rumors she had heard concerning the Fuller murder. Catlett responded that "all he did was kick her and somebody else stuck the pole up in her" because "she wasn't acting right."[4] Finally, Detective Daniel Villars testified that he overheard Christopher Turner tell Overton that the police lacked sufficient evidence against them because

---

[3] Thomas did not see Overton in the alley.

[4] Porter was impeached with her grand jury testimony in which she said Catlett denied any involvement in the crime.

they had not touched Fuller's body and so did not leave any fingerprints. Overton agreed that the police lacked evidence and commented that he knew the two people who gave them up. Turner replied that he knew one of the two, but that he wondered how the police knew he, Overton, and "everybody" were in the alley.

## B. The Defendants' Alibis and the Government's Rebuttal

Appellants Overton, Smith, Christopher Turner, Charles Turner, and Rouse put on alibi defenses.[5] Overton's alibi was supported by three witnesses. Marita Michaels testified that she was in the park at 8th and H Streets with Overton and others from about 10:00 a.m. to about 2:30 p.m. on October 1, drinking and smoking marijuana. Michaels said that she and Overton left the park together and that she saw him walking towards his house, appearing very drunk. Overton's grandmother Edna Adams, and his sister Lottie Overton, testified that he left the house that morning, and returned home drunk between 2:00 and 3:00 p.m. Adams said he remained home and slept until 7:30 p.m.; Overton's sister confirmed that he remained at home on October 1 until at least 5:00 p.m., when she left the house

---

[5] Appellant Yarborough's attorney proffered in his opening statement that the evidence would show Yarborough was at his girlfriend's house at the time of Fuller's murder, but no such evidence was presented. (Yarborough's girlfriend, Chandera Hill, did testify, but only to the fact that Maurice Thomas disliked Yarborough.)

herself. Overton's family members admitted, however, that his grandmother's memory was weak and that his sister and mother had reminded her of many of the details in her testimony. Adams was impeached on various details with her grand jury testimony. Lottie Overton was impeached with her grand jury testimony that Overton had asked her to ask people he knew in the park to be witnesses for him, which was contrary to her trial testimony that he did not do so. Even after being presented with the transcript, she denied having said this to the grand jury. But Adams testified that Overton did tell Lottie and his mother to go ask certain people to be witnesses. Overton himself did not testify at trial.

Smith and Christopher Turner testified that they were at Smith's house on October 1. They said they first learned of Fuller's death later that night in a phone call from a girl named Renee Walker. Three of Smith's relatives corroborated his and Christopher Turner's alibis. Before the grand jury, however, they testified that Smith knew about Fuller's murder as early as 6:00 p.m. on October 1.

Rouse and Charles Turner had conflicting alibis. Rouse testified that he spent the afternoon of October 1 at a recreation center, restaurants and arcades with Charles Turner and a friend named Christopher Taylor, that he went to the alley at 8th and H Streets only after the police were already there, and that he then went at

around 7:00 p.m. to the home of his girlfriend Catrina Ward. But Charles Turner testified he was at home at the time of Fuller's murder and left there only when Rouse and a friend named Vincent Gardner came by and told him someone had been killed in the alley behind H Street.

Christopher Taylor corroborated Rouse, but he was impeached with his admissions to police that he was in the park and heard the group decide to assault Fuller, and that he was in the alley and saw the murder. Catrina Ward confirmed that Rouse came to her house on the night of October 1. She also testified, however, that she saw blood splattered on the bottom of Rouse's pants leg, and that on later occasions Rouse told her he saw Fuller get killed and boasted that he "did the worst thing to that lady in the alley." Charles Turner was impeached with his statement to the police that Rouse and Gardner did not tell him about the crime. And Gardner, testifying as a rebuttal witness, denied going to Charles Turner's house or going anywhere with Rouse on the night of October 1.

## C. Verdicts and Direct Appeal

The case was submitted to the jury on December 9, 1985. On the morning of December 16, the jury asked to see the videotape of Yarborough's incriminating statement to the police. That afternoon, after seven days of deliberations, the jury

returned guilty verdicts against Catlett, Rouse, Smith, Charles Turner, Yarborough, and Webb; at the same time, the jury found their co-defendants Harris and Ruffin not guilty. The jury deliberated for an additional two days before returning its verdicts of guilty against the remaining defendants, appellants Overton and Christopher Turner.

This court affirmed the convictions on direct appeal.[6] In doing so, we acknowledged "some conflict in the testimony of the government's witnesses regarding exactly when each appellant joined in the beating," but stated that "there was overwhelming evidence that each of them was involved at one time or another."[7] For the most part, appellants' claims on direct appeal do not bear directly on the claims now before us.[8]

---

[6] *See Catlett v. United States*, 545 A.2d 1202 (D.C. 1988); *Turner v. United States*, Nos. 86-314 & 90-530 (D.C. 1992) (Mem. Op. & J.).

[7] *Catlett*, 545 A.2d at 1206 n.2; *see also id.* at 1209-10, 1217 (discussing the evidence against Christopher Turner and Overton, respectively).

[8] The exception is Yarborough's argument on direct appeal that the trial court erred in denying his motion to suppress his videotaped statement without considering his age, education, and experience with the criminal justice system. *Id.* at 1207. We discuss this below in connection with Yarborough's ineffective assistance claim.

## II. Appellants' Post-Conviction Motions: *Brady* and IPA Claims

In support of their *Brady* and IPA claims, appellants presented witness recantations, expert witness testimony, and other evidence at the hearing on their post-conviction motions in 2012 in an effort to show that the government withheld materially exculpatory and impeachment evidence from them at trial, and that they were actually innocent of Fuller's robbery, kidnapping, and murder. Appellant Yarborough also testified and presented evidence in support of his ineffective assistance claim. In opposition, the government presented testimony from the investigating detectives and the prosecutors who worked the case in 1984 and 1985. This section of our opinion discusses the evidence relevant to appellants' *Brady* and innocence claims; we discuss the evidence particularly relevant to Yarborough's ineffective assistance claim in a later section.

### A. Witness Recantations

### 1. Calvin Alston and Harry Bennett

Alston and Bennett had finished serving their sentences when they took the stand in 2012 to recant their trial testimony. Each maintained that he knew nothing about Fuller's murder but had been pressured by police into making a false confession and, ultimately, testifying falsely at trial.

Alston was arrested and questioned by Detectives McGinnis and Sanchez about the murder for two-and-a-half hours on November 29, 1984. According to Alston, the detectives yelled at him, accused him of lying, and threatened him with a life sentence if he did not admit his complicity in the murder. They accused him of acting as a lookout for Rouse, Yarborough, Overton, Smith, and others they named. Eventually, Alston testified, he "gave in to their drilling" and falsely admitted to being the lookout and witnessing the attack on Fuller from the end of the alley.

This, Alston said, did not satisfy his interrogators. Detective Sanchez angrily told Alston he could not have seen or heard what was going on in the alley if he merely stood at the end of it. The detectives insisted that he had witnessed Fuller being beaten and sodomized in the garage and urged him to "come all the way clean" and put himself "in the case." Ultimately, Alston testified, he acquiesced and concocted a story of having participated in the crime using the information the detectives provided concerning what happened and who did it. (Nevertheless, Alston still did not admit to personally assaulting Fuller or being the one who proposed robbing her, and he steadfastly denied having received any money from the robbery.) After rehearsing his story with the detectives, they turned on the video camera and recorded his statement.

Bennett, who was interrogated for about four hours after he was arrested on February 6, 1985, similarly claimed that the detectives refused to believe his denials, threatened him with a life sentence, and "kept hammering" at him until he eventually "started saying what was on the news" and repeating whatever the detectives said to him "until they got me to say I was involved." The detectives pressed him to incriminate others, including several of the appellants here, and he did so. Bennett's interrogation also culminated in a videotaped statement. During the videotaping, Bennett testified, the detectives turned the camera off to correct details in his story. At one point, Bennett claimed, he told them that everything he had said was a lie, and the detectives became angry, rewound the tape, and recorded over that portion. Later on, Bennett testified, he was shown part of Yarborough's videotaped statement and given documents pertaining to the case so that he could further tailor his testimony.

Alston and Bennett also claimed that the lead prosecutor in the Fuller case, Jerry Goren, instructed them to alter their testimony at trial. Alston asserted that Goren told him he needed "to put my actual self in the violence that took place" to make his testimony more credible, and to "change the scenario" when other evidence conflicted with his account of the attack on Fuller. Alston said he complied with Goren's demands when, for example, he testified at trial that he

himself came up with the idea to rob Fuller.[9]   Bennett made comparable allegations.  For example, in his videotaped statement, Bennett said he did not see Christopher Turner enter the alley or Catlett hit Fuller; at trial, he testified both of them participated in the beating.  He changed his story, he claimed, "because that's what they told me to say."[10]

To rebut Alston's and Bennett's recantations and repudiate their allegations of misconduct, the government called Jerry Goren and Detectives McGinnis and Sanchez, among other witnesses.  The detectives denied threatening Alston and Bennett with life sentences or telling them what to say or whom to name as

---

[9] Similarly, Alston retreated at trial from his previous statement that he saw Rouse hit Fuller in the back of the head with a two-by-four, and testified instead that he did not see where Rouse hit her, because Goren told him there was no evidence that Fuller was injured in the back of the head.

[10] To support the credibility of Alston's and Bennett's recantations, appellants presented other witnesses who testified to the detectives' heavy-handed interrogation tactics.  In addition, over the government's objection, appellants called an expert on the subject of false confessions.  The witness, Dr. Richard Leo, opined that certain features of the interrogations of Alston and Bennett, such as the detectives' use of deception, yelling, and threats or promises, were associated with a heightened risk of inducing false confessions.  According to Dr. Leo, the errors and incongruities in the confessions of Alston and Bennett could be taken as "indicia of unreliability."

Fuller's assailants.[11]  They similarly denied Alston's claim that they rehearsed with him what he would say on camera and Bennett's claims that they interrupted the taping of his statement to excise his declaration that his confession was a lie, and that they showed him Yarborough's taped statement and documents containing information about the investigation.  Goren likewise categorically denied telling Alston and Bennett what to say, or that they needed to change their testimony.

## 2. Melvin Montgomery and Linda Jacobs

Appellants also called Melvin Montgomery and Linda Jacobs to testify at the 2012 hearing.  Their testimony proved to be unhelpful to appellants.  Montgomery signed an affidavit in 2009 stating he lied on the stand in 1985 and that he saw appellants in the park at 8th and H Streets on October 1 only in the morning, not in the late afternoon (when Fuller was murdered).  At the 2012 hearing, however, Montgomery disavowed the affidavit and denied perjuring himself at trial.

Linda Jacobs professed not to remember her trial testimony or much of anything else, but she insisted that she knew everything she said at trial was a lie

---

[11] The detectives admitted, however, to playing good-cop-bad-cop, yelling, pointing, and slamming their hands on desks.  They also acknowledged telling Alston and Bennett they would face greater consequences if they did not come clean and finger others.

because she was never in the alley on October 1. She vaguely claimed the police told her she was in the alley and "fed [her] information" about the murder, which she repeated to avoid being returned to her parents or accused of the crime herself. When the judge asked her what the government told her to say in 1985, she broke down emotionally and struggled to articulate how Fuller's murder made her feel.

## B. Evidence Not Disclosed to the Defense

Appellants contended that the government withheld evidence that the defense could have used (1) to construct an alternative-perpetrator defense premised on the theory that Fuller was attacked and killed by a single individual (or at most a very small number of persons); and (2) to impeach the prosecution witnesses who identified appellants as the perpetrators.

### 1. Undisclosed Alternative-Perpetrator Evidence

#### a. The Witnesses in the Alley

According to information contained in the files of the police and the prosecutors, three people—Jackie Watts, Willie Luchie, and Ronald Murphy—told investigators that at around 5:30 p.m. on October 1, they happened to be walking through the alley and by the garage where Fuller was murdered. Luchie and Watts

heard the sound of groans coming from inside the garage.  (Murphy recalled Watts saying she heard something like a groan, though he did not claim to have heard anything himself.)  According to Luchie, both doors of the garage were closed at this time.  The trio continued on their way without investigating the source of the groans.  This information was not disclosed to the defense.  At the 2012 hearing, Goren agreed that if the witnesses heard groaning at 5:30 p.m., it meant Fuller was still alive at that time.  He also agreed that if (counterfactually, in his view) the assault was still in progress at that time, it could not have involved more than one or a very few assailants.

### b. James McMillan

James McMillan is one of two persons appellants claim they could have argued at trial was the likely alternative, sole perpetrator of Fuller's murder had the government not withheld information about him.

At trial in 1985, William Freeman, the street vendor who discovered Fuller's body, testified that as he waited for the police to come, he saw two men run into the alley from 9th Street and stand very close to the garage for a few minutes.  Freeman earlier had seen the two men walking up and down 8th Street.

One of the men appeared to be concealing an object under his coat. When the police arrived, the two men ran away up the alley towards I Street.

What Freeman saw was, of course, known to the defense. What the defense did not know, and the government did not disclose, was who the two men were. Freeman had identified them to the police as James McMillan and Gerald Merkerson. It was McMillan who appeared to be hiding something under his coat.

McMillan was a potential suspect in the police investigation. Two other witnesses told police they saw him at the alley at the same time Freeman did, and they confirmed Freeman's observations of his suspicious behavior. (These witnesses also were not disclosed to the defense.) In addition, the police knew that McMillan lived on 8th Street about three doors down from the alley and that he had violently assaulted and robbed two other middle-aged women walking in the vicinity three weeks after Fuller's death.[12] But although the police included McMillan's photograph in the album they showed witnesses to try to identify the

---

[12] McMillan committed the first of these robberies on October 24, 1984, in an alley behind the 1100 block of K Street Northeast. He approached the victim from behind, knocked her to the ground, grabbed her purse and fled. The next day, McMillan and a companion assaulted a woman in the 600 block of 12th Street Northeast. One of the two struck her in the face, breaking her nose, and stole the bag she was carrying.

persons responsible for Fuller's murder, the government did not obtain sufficient evidence to indict him.[13]

At the motions hearing in 2012, appellants presented information about McMillan's subsequent activities following his conviction of the two robberies that he committed in October 1984. McMillan was sentenced to serve eight to twenty-five years in prison. Two months after he was released from prison in July 1992, he killed a 22-year-old woman ("A.M.") in an alley behind the 500 block of 8th Street Northeast, only a few blocks from where Fuller was murdered. This crime had some striking similarities to the attack on Fuller: McMillan abducted A.M. as she walked down the street and dragged her to a secluded spot in the alley, ransacking her personal belongings and leaving them strewn along the path of abduction. After forcing A.M. into a narrow space behind a parked car, McMillan stripped off her underwear, beat her ferociously, and sodomized her. A.M.

---

[13] With two exceptions, no one directly implicated McMillan in the murder. The exceptions were as follows. First, as appellants were aware, James Campbell (the co-defendant whose case was severed) gave a videotaped statement to the police, and in it he named McMillan as one of several individuals congregating in the park at 8th and H Streets who participated in the attack on Fuller. Second, when Christopher Taylor (whom Rouse called at trial to support his alibi) was interviewed by police, he identified McMillan from his photograph as having been part of the group that accompanied Rouse into the alley. Campbell and Taylor subsequently disavowed their statements, and the government realistically could not have used them to prosecute McMillan.

suffered grievous injuries and died three days later. McMillan was convicted of her murder and remains incarcerated.

Appellants argued that this was powerful evidence supporting the thesis that it was McMillan who murdered Fuller. In support of that thesis, they presented Dr. Richard Callery, a forensic pathologist, who testified that the cause of death for both Fuller and A.M. was blunt force trauma to the head and torso, and that each victim had suffered a traumatic anal sodomization resulting in severe internal injuries. Dr. Callery could not say the two murders were "signature crimes," but he testified that, in his experience, anal sodomy with an object occurred in considerably less than one percent of homicide cases. In addition to Dr. Callery's testimony, appellants presented a stipulation that, if he were called, an expert in sexual dysfunctions would testify that someone who commits an act of violent anal sodomy is likely to commit the act more than once.

### c. James Blue

Other information not disclosed to the defense concerned an accusation against a man named James Blue, a habitual criminal who, by 1984, had served time for assault and had a record of arrests for rape, sodomy, and armed robbery. On October 26, 1984, a police lieutenant named Frank Loney happened to be

interviewing a woman named Ammie Davis, who was alleging police misconduct in connection with her arrest for disorderly conduct. According to Loney's written report of the interview, Davis inquired what would happen if she gave the officer "something on a homicide." Insisting that she did not want to get involved and would not testify in court, Davis proceeded to state that someone who just got out of jail on October 1 killed a woman that same day "for just a few dollars" in an alley off of H Street. At first Davis said she was present when the man committed the murder; she then said she was not "with" him and only saw him grab the woman by the back of the neck and pull her into the alley.[14] Davis said she was with her girlfriend "shooting stuff" when this happened and that her girlfriend saw it too. Davis refused to divulge her girlfriend's name but said she and her girlfriend would call the lieutenant the following week. At this point in the conversation, Lieutenant Loney asked Davis to tell him the man's name. After hesitating and saying she did not want to talk about it, Davis responded that "James Blue did it."

Davis was reluctant to say anything more. She refused to give a written or recorded statement and declared that she would not "go to court." Acknowledging

---

[14] When asked whether the man used a weapon, Davis said "he beat the f**k out of her."

that she was afraid of Blue, she brought the interview to a close with the assurance that she would call Lieutenant Loney and let him talk to her girlfriend. Davis never did call back, however.

Lieutenant Loney filed his report of Davis's statement without bringing it directly to the attention of the detectives who were investigating Fuller's murder. It did not come to their attention until August 1985.[15] Goren then proceeded to interview Davis on August 8 and 9. At the hearing in 2012, he recalled her as being "not serious" and "very playful" in their meeting and having nothing to add to what she previously had said about Blue.

Goren testified that he ultimately decided not to inform the defendants in the Fuller case of Davis's allegation because he "believed completely and strongly that Ms. Davis had no evidence in this case and that she was totally incredible." Goren came to that conclusion because Davis had given Loney two different versions of her story; she was unable to provide any further details or any information that could be corroborated; the only information she could provide about the girlfriend who purportedly would have confirmed her account was that her nickname was

---

[15] Detective McGinnis recalled asking Loney why he had not alerted them. Loney told him he did not believe what Davis had said.

"Shorty"; Davis previously had accused Blue of another, unrelated murder and provided information that was determined to be false[16]; and the prosecutors were confident in their body of evidence pointing elsewhere, i.e., at appellants and the other charged defendants. No other evidence implicated Blue in Fuller's murder. Goren admitted, though, that Davis accurately stated that Blue was released from prison on October 1, and that she evidently knew where Fuller was murdered and that she was not attacked with a knife or a gun.

On October 9, 1985, prior to the start of appellants' trial, James Blue shot and killed Ammie Davis. He was convicted of her murder and died in prison in 1993.[17]

---

[16] Goren learned about Davis's prior accusation of Blue in another homicide investigation from an Assistant United States Attorney who had conducted that investigation and who was assisting Goren with the Fuller case.

[17] Goren testified that he reviewed the homicide file relating to Davis's murder and determined that it was unrelated to her accusation of Blue in the Fuller case.

## 2. Impeachment Evidence

The government failed to turn over four types of impeachment evidence.[18] First, the government inadvertently did not disclose that Kaye Porter lied to the police at Carrie Eleby's behest. During one of Eleby's early interviews with the police in November, in which she denied having witnessed Fuller's murder, she claimed that Alston had confessed his involvement in the crime to her. Porter, who accompanied Eleby to the interview, corroborated this claim. Porter later admitted to the police that she did not witness the conversation between Eleby and Alston, and that she had lied about it at Eleby's request. Neither Porter's lie nor Eleby's suborning of it were disclosed to the defense.

Second, the government did not disclose its knowledge of Eleby's extensive PCP use. At trial, she testified that she smoked PCP on October 1, but never before or since. Goren and other members of the investigation and prosecution team knew this was not the truth. Eleby was actually under the influence of PCP

---

[18] Appellants (somewhat vaguely) charge that the government failed to turn over a fifth category of impeachment evidence, to the effect that Carrie Eleby and Linda Jacobs initially denied witnessing the attack on Fuller and stood by their denials for months. But Goren testified that he gave the defense Eleby's grand jury testimony in which she acknowledged her denials, and the trial record suggests that the defense knew of Jacobs's denials, because she was asked about it on cross-examination.

even when she viewed photos and identified persons who were in the alley, and Goren's notes indicate that she "had started using PCP again" later in the investigation.

Third, the government did not disclose grand jury testimony supporting the alibi of a man named Lamont Bobbit, who Alston testified was present in the park and in the alley when Fuller was murdered. Bobbitt told the police he was elsewhere that evening, and in testimony before the grand jury, six witnesses corroborated his alibi. (The prosecutors did not believe the alibi because of contradictions in the testimony, but they decided they nonetheless lacked sufficient evidence to charge Bobbitt with Fuller's murder.)

Finally, the government did not disclose evidence that could have been used to impeach Maurice Thomas. At trial, Thomas testified that after he witnessed the attack in the alley, he ran home and told his aunt "Barbara" what he had seen. He claimed that Barbara told him not to say anything to anyone else. The police interviewed Barbara (whose real name was Dorothy Harris), and she said that she did not recall Thomas ever telling her anything about the attack.

## C. Expert Testimony

Two expert witnesses testified in 2012 in support of the theory that Fuller probably was killed by one to three attackers rather than a large group, though they both admitted it was possible a larger group was involved. Dr. Callery (who also testified to the similarities between the murders of Fuller and A.M.) examined the autopsy report and opined that Fuller's injuries were not as extensive or widely distributed as he would have expected to see from a large-group attack, even if some members of the group merely held the victim and did not inflict injury themselves. Dr. Callery agreed, however, with the 1985 medical examiner's conclusion that it was impossible, from looking at the autopsy report, to say specifically how many people assaulted Fuller.

The second witness was Larry McCann, an experienced homicide investigator who testified as an expert in violent crime analysis and crime scene reconstruction. It was McCann's opinion, based on the autopsy report, crime scene photos and other investigation records, that the attack on Fuller was more likely committed by a single offender than by a large group of individuals acting together. Had there been multiple offenders, McCann testified, he would have expected to see the victim's clothing stretched, torn, or ripped, grab marks or abrasions on her ankles, legs, and wrists, more injuries, and multiple sexual

assaults rather than the one. McCann conceded that, even in a group attack, some assailants might only strike minor glancing blows.

### D. The Motions Judge's Decision

Judge Weisberg rejected appellants' IPA and *Brady* claims. As to the former, the motions judge found that appellants had "not come close to demonstrating actual innocence" because the witness recantations on which appellants relied were not credible. Beyond that, the judge also found "not particularly persuasive" the expert opinion testimony that Fuller likely was beaten by only one or a very few assailants, and appellants' argument that the similarities between the murder of Fuller and McMillan's murder of A.M. proved that McMillan was Fuller's sole assailant.

Turning to appellants' *Brady* claims, the motions judge concluded there was no reasonable probability that the undisclosed evidence would have changed the outcome of the trial. This was so for three basic reasons: First, the judge noted, Ammie Davis's hearsay accusation against James Blue "was almost certainly inadmissible," and, in any event, it was "thoroughly discredited" and would not have convinced the jury to disbelieve the numerous eyewitness accounts of an attack by a large group of young men. "Not one of the approximately 400 other

witnesses interviewed by the government mentioned James Blue as a possible perpetrator," the judge pointed out, "either alone or with others."

Second, the judge reasoned, the evidence pertaining to James McMillan was not material because no witness put him in the alley during the attack, and because even if he was present then, "it would not prove anything" about appellants since McMillan could have been a participant in the attack with them or merely a bystander. "For the 'McMillan evidence' to be material in the *Brady* sense," the judge added, "he would have had to have committed the crime by himself or with Merkerson to the exclusion of the petitioners, and that possibility flies in the face of all the evidence."

Third, the judge found the undisclosed impeachment evidence to be of little significance even when viewed cumulatively. While Kaye Porter's admission that she lied about hearing Alston's confession, at Eleby's request, could have been used to impeach Porter and Eleby, the nondisclosure was not material because Porter was a "relatively minor" witness at trial and Eleby was extensively impeached at trial with her prior inconsistent statements and her admitted lies before the grand jury. Similarly, Eleby was cross-examined at trial about her use of PCP and additional evidence on that score would not have made a difference.

Alibi testimony contradicting Alston's claim that someone other than appellants was present in the park likewise would have been of little help to appellants, the judge concluded, particularly since the alibi "may or may not have been truthful."[19] Lastly, the judge acknowledged that Maurice Thomas was "an important eyewitness because he was able to identify several of the [appellants] and had no apparent bias or motive to fabricate," and he thought it "at least arguable" that the government should have disclosed that Thomas's aunt did not recall his telling her that he had just seen someone attacked in the alley. Nevertheless, finding *inter alia* that Thomas testified convincingly at trial despite being cross-examined extensively, and that his aunt's denial could be explained by Thomas's testimony that she told him to forget what he had seen,[20] the judge concluded that even if Thomas had been impeached by his aunt's statement, "no juror would have concluded that he was making it all up."

---

[19] Citing *Wu v. United States*, 798 A.2d 1083, 1089-90 (D.C. 2002), the judge also held that appellants were procedurally barred from raising a *Brady* claim based on the government's non-disclosure of alibis offered by witnesses whom Alston or Bennett claimed were present during the murder, because the trial judge had ruled that the government did not have to disclose such evidence and appellants did not appeal that ruling.

[20] The judge also cited Goren's impression, recorded in his contemporaneous case notes, that Thomas's aunt was "a bit of an alcoholic."

### III. Analysis of Appellants' *Brady* Claims

### A. *Brady* and the Applicable Standard of Review

Appellants invoke a constitutional duty of governmental disclosure in criminal cases that the Supreme Court recognized in *Brady v. Maryland*[21] over two decades before their trial: "The Due Process Clause of the Fifth Amendment requires the prosecution to disclose to the defense, upon request, material evidence—including impeachment evidence—that is favorable to the accused."[22] The purpose of this duty "is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur."[23] The failure to disclose materially favorable evidence constitutes a due process violation "irrespective of the good faith or bad faith of the prosecution"[24] and without regard to whether the evidence was actually known by

---

[21] 373 U.S. 83, 87 (1963).

[22] *Miller v. United States*, 14 A.3d 1094, 1106 (D.C. 2011). It is now clear that the suppression of materially favorable evidence is a violation of due process "regardless of [defense] request." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (citing *United States v. Bagley*, 473 U.S. 667, 682, 685 (1985)).

[23] *Bagley*, 473 U.S. at 675.

[24] *Brady*, 373 U.S. at 87.

the individual prosecutor, or merely by "others acting on the government's behalf in the case, including the police."[25]

"To determine on appeal whether the government, through its representatives in the trial court, has violated its obligations under *Brady*, we consider: (1) whether the information in question is favorable to the accused; (2) whether this information was possessed and suppressed by the government, either willfully or inadvertently; and (3) whether that information was material" to guilt or punishment.[26] Appellants have the burden of proving a *Brady* violation.[27] In this case, although we think it may be doubted whether some of the undisclosed evidence in question was truly favorable to appellants, we need not linger over such doubts. The primary and dispositive question with respect to all of appellants' *Brady* claims is the question of materiality.

Evidence is material within the meaning of *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

---

[25] *Kyles*, 514 U.S. at 437.

[26] *Vaughn v. United States*, 93 A.3d 1237, 1254 (D.C. 2014) (internal quotation marks omitted).

[27] *Mackabee v. United States*, 29 A.3d 952, 959 (D.C. 2011).

proceeding would have been different."[28]  Materiality is "not a sufficiency of the evidence test."[29]  Rather, evidence is material if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[30]  *Brady* materiality must be assessed in terms of the cumulative effect of all suppressed evidence favorable to the defense, not on the evidence considered item by item.[31]  The cumulative effect of a collection of suppressed evidence may undermine confidence in the outcome of the trial even where each piece of evidence, viewed in isolation, would be insufficient.  Of course, just as the trial court did, "[w]e evaluate the tendency and force of the undisclosed evidence item by item; there is no other way.  We evaluate its cumulative effect for purposes of materiality separately and at the end of the discussion[.]"[32]

---

[28]  *Miller*, 14 A.3d at 1115 (quoting *Bagley*, 473 U.S. at 682).

[29]  *Kyles*, 514 U.S. at 434.

[30]  *Id.* at 435.

[31]  *Id.* at 421.

[32]  *Kyles*, 514 U.S. at 436 n.10.

Some past decisions of this court have reviewed a trial court's ruling on *Brady* materiality for "reasonableness."[33] Our more recent cases, following the reasoning of the dissent in *Farley v. United States*,[34] have questioned the aptness of that standard.[35] As Judge Ruiz pointed out in her *Farley* dissent, the Supreme Court has consistently reviewed *Brady* rulings *de novo*,[36] and a *de novo* standard of review "is consistent with the origin of the *Brady* materiality test, which is derived from the prejudice prong for ineffective assistance of counsel—an inquiry which

---

[33] *E.g.*, *Davies v. United States*, 476 A.2d 658, 661 (D.C. 1984) ("Where, as here, the trial court has determined that asserted *Brady* material would not have materially affected the verdict, the reviewing court is limited to a determination of whether that decision was reasonable. *United States v. Agurs*, 427 U.S. 97, 114 (1976). An independent review is precluded. *Id.* It cannot be said that the trial court's ruling on the *Brady*-based new trial motion was unreasonable.").

[34] 767 A.2d 225, 233 (D.C. 2001) (Ruiz, J., dissenting).

[35] *See Zanders v. United States*, 999 A.2d 149, 162 (D.C. 2010); *Watson v. United States*, 940 A.2d 182, 187 (D.C. 2008); *Powell v. United States*, 880 A.2d 248, 254-55 (D.C. 2005); *see also Miller*, 14 A.3d at 1120; *id.* at 1129 n.11 (Fisher, J., dissenting).

[36] *See Farley*, 767 A.2d at 233 ("No other conclusion can be reached from the Supreme Court's opinions in *Kyles, Bagley, Wood* [*v. Bartholomew*, 516 U.S. 1 (1995)] or *Strickler* [*v.Greene*, 527 U.S. 263 (1999)], all of which exhaustively review the evidence, without expressing a deferential standard or, in fact, affording any deference to the lower courts' determinations.") (footnotes omitted). This seems to be one of the respects in which *Agurs*, the case that this court cited in *Davies* as mandating a deferential "reasonableness" standard of review, has been superseded.

the [Supreme] Court has held presents a mixed question of law and fact."[37] Consequently, without resolving the issue of the proper standard of review, we latterly have "avoided applying the lesser 'reasonableness' standard[] where we have been able to conclude instead that even under *de novo* review, no material violation occurred."[38]

Notwithstanding our general adherence to *stare decisis*, we are not obligated "to follow, inflexibly, a ruling whose philosophical basis has been substantially undermined by subsequent Supreme Court decisions."[39] We think the proper approach is to recognize that a pure "reasonableness" standard of review is imprecise and does not meet the needs of the due process inquiry at stake in *Brady* cases. It is more accurate and appropriate to say, as we and other courts have said, that whether appellants have established a violation of *Brady* is a mixed question of fact and law.[40] "In that circumstance, we review the trial court's legal conclusions on a *de novo* basis and its factual findings under the clearly erroneous

---

[37] *Farley*, 767 A.2d at 233.

[38] *Zanders*, 999 A.2d at 162.

[39] *Frendak v. United States*, 408 A.2d 364, 379 n.27 (D.C. 1979).

[40] *Miller*, 14 A.3d at 1120; *see also Farley*, 767 A.2d at 234 n.6 (Ruiz, J., dissenting) (citing federal cases).

standard."[41]  Materiality—defined as whether the government's failure to disclose exculpatory evidence undermines our confidence in the verdict—is, in the end, a legal conclusion.[42]  Therefore, while we defer in this case to the motions judge's assessments of credibility, evaluations of the weight of the evidence and the inferences to be drawn therefrom, and findings of historical fact, so long as they have record support, we respect, but we do not accord comparable deference to, the judge's determination of the ultimate question of *Brady* materiality.  With due appreciation for the fact-bound nature of that ultimate question, we must review it *de novo* on appeal.

Pursuant to the foregoing principles, we now proceed to discuss the significance of the undisclosed evidence at issue in this appeal—first on an item-by-item basis, and then cumulatively.

---

[41] *Id.* (quoting *United States v. Joseph*, 996 F.2d 36, 39 (3d Cir. 1993) (alteration omitted); *accord Vaughn*, 93 A.3d at 1254.

[42] Whether we choose to characterize materiality as a question of law or of "ultimate fact" is of little moment.  *See Miller*, 14 A.3d at 1120 n.32 ("We also generally review *de novo* so-called findings of 'ultimate fact' . . . , since they are really conclusions of law.").

## B. The Witnesses in the Alley

The statements of Watts, Luchie, and Murphy had the potential to advance appellants' single-perpetrator theory.[43] The groans heard by Watts and Luchie tend to show that Fuller was still alive between 5:30 and 5:45 p.m. And the fact that Luchie saw *both* garage doors closed, while one of the doors was open when William Freeman came by around 6:00 p.m. and discovered Fuller's body, could be taken to suggest that the attack was then-occurring and that the true killer(s) opened one of the doors and fled in the interim. If the attack was in progress when Watts, Luchie, and Murphy walked by the garage, then as Goren acknowledged, it could not have been committed by a large group of people.

As the government argues, if Fuller was being assaulted when Watts, Luchie, and Murphy passed next to the garage, one might think they would have heard more noise; the fact that they heard only the sounds of groans would seem to imply that the attack was over by then and that Fuller's assailants were gone. Moreover, Luchie might have been mistaken in recalling that both garage doors were closed (Watts and Murphy did not say that), and even if they were, there was

---

[43] Appellants contend that one, two, or at most three people killed Mrs. Fuller, but for ease of discussion, we shall refer to their view of the case as the single-perpetrator theory.

time for someone unknown to open one of the doors and depart before Freeman arrived and found Fuller's body. Despite these considerations, we agree with appellants that the alley witness evidence has potential weight in a cumulative materiality analysis.[44]

## C. James McMillan Evidence

The government had reason to suspect James McMillan of having participated in Fuller's murder. He was a violent criminal prone to assaulting and robbing vulnerable women in the area; he was seen in the alley shortly after Fuller's murder, acting suspiciously and concealing an object under his coat; he fled when the police arrived; and James Campbell and Christopher Taylor identified him as having joined in the attack (though Campbell's hearsay identification could not have been introduced in evidence at appellants' trial, Taylor presumably would have denied or disavowed it had he been asked, and their identifications of McMillan would not have supported a single-perpetrator theory). That McMillan committed a similarly heinous sexual assault and murder some years later only heightens the suspicion of his involvement. The parties disagree,

---

[44] *See Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) ("[E]vidence with some element of untrustworthiness is customary grist for the jury mill.").

however, as to whether the evidence of McMillan's other crimes is relevant to the *Brady* analysis.

### 1. The October 1984 Robberies

The parties disagree as to whether evidence of the two robberies McMillan committed in October 1984 would have been admissible at trial. Appellants and the government agree that the robberies did not amount to "reverse *Drew* evidence," i.e., "evidence of a recent similar crime with a distinct modus operandi—which the defendant could be shown not to have committed."[45] The two robberies, in which the perpetrator attacked the victims, robbed them, and then fled without causing further harm, do not share a sufficiently "distinct modus operandi" with the assault on Fuller to justify the inference that the same person must have committed all three crimes.

Appellants contend, however, that evidence of the robberies committed by McMillan would have been admissible in support of a third-party perpetrator

---

[45] *Bruce v. United States*, 820 A.2d 540, 543 (D.C. 2003) (quoting *Newman v. United States*, 705 A.2d 246, 253 (D.C. 1997)).

defense under *Winfield v. United States.*[46]   Setting aside for the time being the separate question of whether evidence fairly implicating McMillan in the attack on Fuller would have raised sufficient doubts about appellants' participation in the attack to show a *Brady* violation, we think appellants are correct that McMillan's robberies would have been admissible in support of such a defense.

"*Winfield* evidence" is evidence offered to show that someone other than the defendant committed the crime.   For such evidence to be admissible,

> there must be proof of facts or circumstances which tend to indicate some reasonable possibility that a person other than the defendant committed the charged offense. The focus of the standard is not on the third party's guilt or innocence, but on the effect the evidence has upon the defendant's culpability, and in this regard it need only *tend* to create a reasonable doubt that the defendant committed the offense.[47]

---

[46]   676 A.2d 1 (D.C. 1996) (en banc).   On the distinction between reverse *Drew* evidence and *Winfield* evidence, *see Bruce*, 820 A.2d at 543-45. "Admissibility under the *Winfield* standard . . . is broader" than under the standard for reverse *Drew* evidence.  *Id.* at 545.

[47] *Winfield*, 676 A.2d at 4 (internal quotation marks omitted).   There is "no requirement that the proffered evidence must prove or even raise a strong probability that someone other than the defendant committed the offense."  *Id.* (quoting *Johnson v. United States*, 552 A.2d 513, 517 (D.C. 1989)).

*Winfield* evidence is not limited to proof of the third party's motive and "practical opportunity" to commit the crime;[48] it also may include evidence that the third party committed "another crime like the one before the court."[49] The crimes "need not be identical" for such evidence to be admissible, if "the totality of the circumstances demonstrates a reasonable probability that the same person committed both offenses."[50] Conversely, "the trial court should exclude *Winfield* evidence if it "is too remote in time and place, completely unrelated or irrelevant to the offense charged, or too speculative with respect to the third party's guilt.'"[51] And even if the proffered *Winfield* evidence satisfies the threshold requirement of relevance, the trial court has discretion to exclude it based on a determination that its marginal probative value is substantially outweighed by the risk of unfair prejudice, confusion of the jury, or similar considerations.[52] However, "[c]lose

---

[48] *Winfield*, 676 A.2d at 5.

[49] *Bruce*, 820 A.2d at 543 (quoting *Newman*, 705 A.2d at 254).

[50] *Bruce*, 820 A.2d at 544 (alteration and citation omitted).

[51] *Thomas v. United States*, 59 A.3d 1252, 1264 (D.C. 2013) (quoting *Resper v. United States*, 793 A.2d 450, 460 (D.C. 2002)).

[52] *Winfield*, 676 A.2d at 5.

questions of admissibility should be resolved in favor of inclusion, not exclusion."[53]

Here, we think it reasonable to conclude that McMillan's commission of two other robberies in October 1984 would have corroborated the other evidence that he joined in the October 1 attack on Fuller. The government principally argues that the probative value of that corroboration would have been minimal, and substantially outweighed by the risk of unfair prejudice, because there were few similarities between the two robberies and Fuller's murder.[54] We disagree, inasmuch as the three crimes all involved violent assaults and robberies of middle-aged women who were walking alone on the street, and all took place in the same neighborhood in a span of less than a month. That the attack on Fuller was far more vicious and severe than the other two robberies does not negate these points of similarity. We therefore are satisfied that a trial judge would be safely within her discretion in admitting the evidence of McMillan's robberies under *Winfield*; accordingly, they are relevant to the *Brady* materiality analysis.

---

[53] *Bruce*, 820 A.2d at 544 (citing *Winfield*, 676 A.2d at 6-7).

[54] The government also argues that McMillan would not still have been hanging around the garage when the police arrived had he been one of the assailants, but this is not entirely persuasive; appellants Catlett and Overton were still in the park across the street when the police came to the scene.

## 2. The 1992 Murder of A.M.

We reach a different conclusion with respect to McMillan's murder of A.M. seven years after appellants' trial. Because evidence of this murder obviously could not have been presented at appellants' trial, it is not relevant to whether the government violated its *Brady* obligations. A *Brady* violation cannot be predicated on the government's failure to do the impossible and disclose evidence that does not yet exist. McMillan's murder of A.M. likewise has no bearing on the question of the materiality of any evidence that the government actually did withhold from the defense. This is so because materiality under *Brady* turns on a retrospective assessment of whether a past trial might have had a different outcome had available evidence not been kept from the defendant—not on whether new, previously unobtainable evidence not kept from the defendant might lead to a different result in a new trial. There are other procedures available for exploring whether new evidence calls for a new trial—for example, the procedures of the Innocence Protection Act that appellants employed in this case—but they are subject to different standards; simply put, "*Brady* is the wrong framework" to use for obtaining post-conviction relief based on new evidence.[55]

---

[55] *Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69 (2009) (holding that the *Brady* right of pretrial disclosure does not provide a post-conviction right of access to evidence for newly available DNA testing).

## D. Ammie Davis's Accusation of James Blue

There is reason to doubt that Ammie Davis's accusation of James Blue would have carried significant weight with the jury, given her lack of credibility and the complete absence of other evidence associating Blue in any way with Fuller's murder. But we need not examine that question. Davis, having been murdered prior to the start of appellants' trial, was unavailable to testify at it. Her out-of-court statements accusing Blue did not fall within any exception to the rule against hearsay. Hence her statements would have been inadmissible as evidence that Blue killed Fuller. Evidence that is inadmissible cannot be material for *Brady* purposes unless there is a reasonable probability that its disclosure would have resulted in a different trial outcome because it is likely to have led to the discovery of other, admissible evidence favorable to the defense.[56] No such probability has

---

[56] *See Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (holding that undisclosed polygraph results were not material where they were "inadmissible under state law, even for impeachment purposes," and the possibility that disclosure "might have led respondent's counsel to conduct additional discovery that might have led to some additional evidence that could have been utilized" was "mere speculation"); *United States v. Morales*, 746 F.3d 310, 314-15 (7th Cir. 2014) (finding the majority view in the federal courts of appeals, that inadmissible evidence may be material if it could have led to the discovery of admissible evidence, to be "more consistent" with *Wood* than "a rule that restricts *Brady* to formally admissible evidence") (citing cases); *United States v. Derr*, 990 F.2d 1330, 1335-36 (D.C. Cir. 1993) (rejecting *Brady* claim based on government's failure to disclose inadmissible hearsay of declarant who would be unavailable to testify at trial).

been shown here. Appellants have not demonstrated any likelihood that they would have located and obtained helpful testimony from the girlfriend Davis mentioned, or that they would have discovered any other admissible evidence implicating Blue in Fuller's murder.

Appellants, citing *Chambers v. Mississippi*,[57] contend that due process would have required the trial court to admit Davis's statement for its truth in spite of the rule against hearsay. We disagree. As the Supreme Court has explained, the "fundamental" right of an accused in a criminal case "to present witnesses in his own defense"[58] is not "an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."[59] "Evidentiary rules excluding evidence from criminal trials violate the constitutional right to present a defense only if they 'infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are

---

[57] 410 U.S. 284 (1973).

[58] *Id.* at 302.

[59] *Taylor v. Illinois*, 484 U.S. 400, 410 (1988).

designed to serve.'"[60]

In *Chambers*, the Supreme Court confronted two such dubious evidentiary rules. The defendant in that case was charged with murder. At trial, he sought to prove that another man named McDonald had confessed to the crime orally and in writing, but he was stymied by two Mississippi rules of evidence. First, he was prevented from cross-examining McDonald (who had repudiated his written confession) by Mississippi's common law "voucher" rule prohibiting a party from impeaching his own witness.[61] In addition, he was unable to present the testimony of three credible witnesses to whom McDonald had confessed orally, because Mississippi applied its hearsay exception for declarations against interest only to statements against pecuniary interest, and not to statements against the declarant's penal interest, regardless of their trustworthiness.[62]

---

[60] *Heath v. United States*, 26 A.3d 266, 276 (D.C. 2011) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)); *see, e.g.*, *United States v. Scheffer*, 523 U.S. 303, 309, 316-17 (1998) (rejecting a constitutional challenge to a rule excluding lie detector results because the rule was not arbitrary or disproportionate to the ends it was designed to serve).

[61] *Chambers*, 410 U.S. at 291-92.

[62] *Id.* at 292-94, 299.

The Supreme Court reversed Chambers's conviction, holding that "under the facts and circumstances of this case the rulings of the trial court [in combination] deprived Chambers of a fair trial" by unjustifiably interfering with his fundamental right to defend himself.[63] As the Court explained, while an accused exercising that right "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence,"[64] the evidentiary restrictions imposed on Chambers were not designed or implemented to serve those purposes.

The rule that a party may not impeach his own witness was, in the Court's words, "a remnant of primitive English trial practice" that "bears little present relationship to the realities of the criminal process" in the present day.[65] The rule "has been condemned," the Court added, "as archaic, irrational, and potentially destructive of the truth-gathering process."[66] In addition, while the Court acknowledged that the "materialistic limitation" of the declaration-against-interest hearsay exception to statements against pecuniary interest "might serve some valid

---

[63] *Id.* at 303.

[64] *Id.* at 302.

[65] *Id.* at 296.

[66] *Id.* at 296 n.8.

state purpose by excluding untrustworthy testimony" in some cases, "[t]he hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability."[67] Each confession was made "spontaneously to a close acquaintance shortly after the murder had occurred"; "each one was corroborated by some other evidence in the case"; "each confession here was in a very real sense self-incriminatory and unquestionably against [the declarant's] interest"; and "[f]inally, if there was any question about the truthfulness of the extrajudicial statements, McDonald was present in the courtroom and was under oath" and subject to cross-examination and observation by the jury.[68] Given also that McDonald's out-of-court confessions were "critical" to Chambers's defense, implicating his "constitutional rights directly affecting the ascertainment of guilt," the Court concluded that Mississippi's "hearsay rule may not be applied mechanistically to defeat the ends of justice."[69]

---

[67] *Id.* at 299-300.

[68] *Id.* at 300-01. "McDonald's presence," the Court observed, "deprives the State's argument for retention of the penal-interest rule of much of its force." *Id.* at 301 n.21.

[69] *Id.* at 302.

It is plain that this case is nothing like *Chambers*. Davis's statement implicating Blue in Fuller's murder would have been excluded at appellants' trial pursuant to a routine and uncontroversial application of the basic rule against hearsay; unlike the statements against penal interest in *Chambers*, it did not even arguably fall within any of the recognized hearsay exceptions for statements "made under circumstances that tend to assure reliability and thereby compensate for the absence of the oath and opportunity for cross-examination."[70] The Supreme Court cast no doubt in *Chambers* on the constitutionality of excluding such ordinary hearsay evidence when offered by the defendant in a criminal trial. On the contrary, the Court acknowledged that "perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay," and it agreed that criminal defendants "must comply" with such established rules.[71] As the Court said, the rule against hearsay is

> grounded in the notion that untrustworthy evidence should not be presented to the triers of fact. Out-of-court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and

---

[70] *Id.* at 299.

[71] *Id.* at 302.

he is not available in order that his demeanor and credibility may be assessed by the jury.[72]

Every one of the Court's enumerated reasons why hearsay is excluded as untrustworthy applies to Davis's statement. In short, the exclusion of that statement on hearsay grounds would not have been arbitrary or disproportionate to the purposes that the rule against hearsay is designed to serve. It therefore would not have violated appellants' due process rights. The Constitution does not displace the hearsay rule in this case.[73]

---

[72] *Id.* at 298.

[73] Appellants argue that if the government had disclosed Davis's statement when the prosecutors first learned of it in August 1985, her "transience and drug use could have caused defense counsel to procure an admissible statement from her in the event she became unavailable." We do not see how appellants would have accomplished this. Depositions to preserve testimony for trial are disfavored in criminal cases, and the burden is on the party seeking a deposition to demonstrate "exceptional circumstances" necessitating it. *See* Super. Ct. Crim. R. 15 (a); *United States v. Kelley*, 36 F.3d 1118, 1124 (D.C. Cir. 1994). Among other things, this normally calls for a showing that the witness will be unavailable to testify at trial, *id.* at 1125—a showing appellants could not have made prior to Davis's death.

Appellants suggest they could have asked Davis to prepare a statement about Blue's involvement in Fuller's murder that would have been admissible at trial in case of her unavailability through another witness under the hearsay exception for past recollection recorded. *See Mitchell v. United States*, 368 A.2d 514, 517-18 (D.C. 1977). But appellants could not have satisfied the requirements for admission under that exception because such a statement would not have been made at or near the time of the putative assault by Blue on Fuller, and because it does not appear appellants could have called a witness who would have been able

*(continued…)*

Arguably the fact that Davis accused Blue of complicity in Fuller's murder would have been admissible for the non-hearsay purpose of showing that the government's investigation of the crime was (in this one respect at least) less than diligent. Suppressed evidence of an inadequate investigation is potentially material.[74] Although the government is correct that Davis's statement might nevertheless have been excluded as more prejudicial than probative, it is enough to say that the trial judge would have had discretion to admit it for this limited purpose. On the other hand, if the evidence had been admitted for this limited purpose, we think its impact would have been negligible absent any showing either that more diligent investigation of Blue would have been productive, or that a lack of thoroughness went beyond the belated follow-up with Ammie Davis and infected the investigation in other ways so as to undermine the charges against

---

*(continued…)*
to vouch for the accuracy of the statement from personal knowledge of that event. *See id.*

[74] *See Kyles v. Whitley*, 514 U.S. 419, 445 (1995) (holding statements material because they "would have raised opportunities to attack . . . the thoroughness and even the good faith of the investigation").

appellants. Neither showing would have been made.[75] And evidence that the government performed a less than thorough investigation of the allegation against Blue would have had little likelihood of persuading the jury that a *different person*—i.e., James McMillan—was the true killer. To the contrary, the government would have been able to demonstrate that the investigation was indeed quite a thorough one overall, involving over four hundred interviews, and that McMillan's culpability was examined.

Appellants further argue that even if Davis's statement itself was inadmissible, it might have led them to discover admissible evidence that could have affected the outcome of the trial in their favor.[76] However, appellants have not identified any such evidence that might affect our evaluation of the materiality

---

[75] We presume, of course, that the jury would obey a limiting instruction and not consider Davis's statement as evidence that Blue himself murdered Fuller. *See, e.g.*, *Knight v. Georgetown Univ.*, 725 A.2d 472, 483 (D.C. 1999).

[76] *Cf. United States v. Bagley*, 473 U.S. 667, 683 (1985) ("[T]he reviewing court may consider directly any adverse effect that the prosecutor's failure to respond [to a *Brady* request] might have had on the preparation or presentation of the defendant's case."); *Miller v. United States*, 14 A.3d 1094, 1108 (D.C. 2011) ("An important purpose of the prosecutor's obligations under *Brady* is to allow defense counsel an opportunity to investigate the facts of the case and, with the help of the defendant, craft an appropriate defense.") (internal quotation marks omitted); *Boyd v. United States*, 908 A.2d 39, 61 (D.C. 2006) ("[T]he prosecutor must make the materiality determination . . . with a view to the need of defense counsel to explore a range of alternatives in developing and shaping a defense.").

of the undisclosed evidence at issue. We note that appellants did not proffer that timely disclosure of Davis's statement would have enabled them to find and present favorable testimony from the girlfriend who supposedly could have corroborated Davis's accusation against Blue.

In sum, the evidence concerning James Blue contributes to the cumulative materiality of the undisclosed evidence only to the very limited extent it would have had value in demonstrating a slip-up in the government's investigation.

### E. Impeachment Evidence

We agree with Judge Weisberg that the withheld impeachment evidence, whether considered piece-by-piece or in conjunction with the other undisclosed evidence, had little prospect of changing the result at trial. Although "impeaching information does not have a lesser standing in the context of the government's *Brady* disclosure obligations" than affirmatively exculpatory information,[77] it "can be immaterial . . . if it is cumulative and the witness has already been impeached

---

[77] *Vaughn v. United States*, 93 A.3d 1237, 1254 (D.C. 2014).

by the same kind of evidence."[78]  That principle applies to some of the impeachment evidence at issue here.

The fact that Kaye Porter initially lied to the police at Carrie Eleby's behest, to corroborate Eleby's story that she had not seen the assault and that Alston had confessed his involvement to her, could have been used to impeach both Porter and Eleby.  But Porter provided evidence at trial only against appellant Catlett—she testified to a conversation in which she asked him about Fuller's murder, and he responded that he "didn't do nothing to her" and that "all he did was kick her and somebody else stuck the pole up in her" because "she wasn't acting right."  This testimony was impeached with Porter's grand jury testimony that Catlett simply told her he "didn't do nothing to that lady."  Moreover, the other evidence against Catlett was second only to that against Rouse:  among other things, Alston, Bennett, Eleby, and Thomas all testified that they saw Catlett physically attack Fuller;  Montgomery saw him in the park before the murder and watched him cross the street and head toward Fuller; Thomas also recalled hearing Catlett tell someone why he and Fuller's other assailants killed her; and Catlett had no alibi.

---

[78]  *Watson v. United States*, 940 A.2d 182, 187 (D.C. 2008); *see also Williams v. United States*, 881 A.2d 557, 562-63 (D.C. 2005).

Eleby too was impeached with her prior false statements to the police and to the grand jury and contradicted by other witnesses, and as described above, her inability to remember and keep her facts straight also undermined her credibility. It is hard to see why the additional impeachment would have made a difference to the jury's assessment of Eleby's credibility.

The undisclosed evidence of Eleby's extensive PCP use was also of little consequence. Eleby's claim that she smoked PCP for the first and last time on October 1 was unbelievable on its face. Jacobs testified that she saw Eleby use PCP at other times, and even if the jury disbelieved most of Jacobs's testimony, it had no reason to doubt her assertion, otherwise unrelated to the case, that her close friend was a drug user.

We likewise are not persuaded that disclosure of the evidence contradicting Alston's assertion that Lamont Bobbitt was one of the persons present in the park and alley at the time of Fuller's murder (i.e., the evidence supporting Bobbitt's alibi, which several witnesses corroborated in testimony before the grand jury) would have made a difference with respect to the jury's evaluation of Alston's credibility. The jury was willing to acquit Harris even though Alston testified that he was an active participant in the murder. We do not see how knowing that one

other person (who was not another defendant at trial) whom Alston named as present was not actually there would have swayed the jury.

Finally, although Maurice Thomas's testimony may have been an important factor in the jury's verdicts, his aunt's statement (that she did not recall Thomas having told her about the attack on Fuller) was unlikely to have discredited Thomas in any significant way. One of the strengths of his trial testimony was his candid acknowledgement of what he could not remember, namely whether or not Christopher Turner and Smith were present in the alley. Because he never claimed excellent recall of every detail of what he saw, it was not significant that his aunt could not corroborate a relatively minor part of his testimony. And if, as Thomas testified, she had told him not to report what he saw, she had every reason to deny their conversation when she spoke to the police. Moreover, the jury was willing to convict even where it did disbelieve Thomas, for it found Overton guilty despite Thomas's claim that he was not in the alley.

In sum, we think none of the impeachment evidence was material individually, and that it adds little to any cumulative materiality analysis.

## F. Cumulative Materiality of the Undisclosed Evidence

We may turn now to the question of the cumulative materiality of the undisclosed exculpatory and impeachment evidence. To reiterate, the question is whether there exists a reasonable probability that the result of appellants' trial would have been different had the evidence been disclosed to the defense. We have concluded that, in addressing this question, our primary focus must be on the potential value to the defense of (1) the testimony of Watts and Luchie that they walked past the garage where Fuller lay dying at around 5:30 p.m. and heard groans coming from inside, and that the garage doors were closed; and (2) the identification of James McMillan as the person seen acting suspiciously in the vicinity of the garage sometime after the murder. While we do not ignore the potential value to the defense of the impeachment evidence and the limited non-hearsay use that appellants could have made of Davis's accusation of James Blue, we think the contribution of that evidence would have been negligible for the reasons we have already given.

Appellants argue that the undisclosed evidence was valuable not because it exculpated any of them directly, but because it would have enabled them to present an alternative single-perpetrator theory of the crime (with expert witness support) as a counter-narrative to the prosecution's case: Watts and Luchie may have

overheard the assault being committed by only a limited number of persons—perhaps only one—rather than the large group described by the prosecution witnesses; and McMillan, given his presence on the scene and criminal history, plausibly may have been one of that limited number of assailants, though no prosecution witness named him as such. The physical (as opposed to the eyewitness) evidence of the attack adduced at trial arguably supported, or at least was not inconsistent with, a single-perpetrator theory, and there was some other evidence at trial to corroborate it.[79]

The fact remains that the government presented the testimony of several eyewitnesses, including two participants who admitted their own guilt, who did implicate appellants in a group attack. No witness to the attack who testified at trial disputed their overall description of how the crime was committed, and the eyewitnesses were corroborated by evidence of incriminating admissions by some of the appellants. It is true that the prosecution witnesses contradicted themselves and each other on various points, and some of them had potential motives to lie or

---

[79] Notably, perhaps, William Freeman testified at trial that throughout his day at 8th and H Streets, working as a street vendor, he never saw a large group of young people in the area, never saw anyone running towards or away from the vicinity of the garage, and never heard any shouts coming from the area of the garage.

other problems with their testimony. Moreover, no fingerprint, DNA, or other forensic evidence implicated any defendant.[80] But the undisclosed evidence (other than the impeachment evidence that we have discounted) did not take advantage of those weaknesses; it did not, for example, contradict the government witnesses' accounts, demonstrate their bias, or incorporate contrary forensic evidence pointing to perpetrators other than the defendants on trial.

Nor, we conclude, did the undisclosed evidence truly provide substantial support for a single-perpetrator theory of the crime, or any theory that excluded appellants as the perpetrators. The groans, undoubtedly Fuller's, that Watts and Luchie heard coming from the garage between 5:30 and 5:45 p.m. did not mean the assault was still occurring or that any assailant was still present. On the contrary, the fact that Watts and Luchie heard nothing else and saw no signs of any activity more likely indicated that the assault was over and that the assailants were gone. This was entirely consistent with the government's evidence, and provided no reason to doubt it, inasmuch as Fuller left her house around 4:30 p.m. and all of the witnesses described a fast-moving event lasting, in all probability, no more than a

---

[80] In 1985, when this case was tried, DNA analysis was in its infancy. In 2011, the trial court ordered DNA testing of swabs taken from Fuller's body, a semen sample from her pantyhose, various articles of her clothing, and a metal pole found at the scene, but the tests did not result in a derivable DNA profile.

few minutes. Luchie's observation that both garage doors were closed shortly before Freeman found one of them open would have raised a question, but it too does not mean anyone was still in the garage with Fuller when Luchie passed by. It surely would not have been enough to turn a jury that found the government's witnesses credible, as this jury did. It is far more likely, in our view, that the jury would have believed that Luchie was mistaken, or that someone came upon the scene and opened the garage door in the interval between Luchie's departure and Freeman's arrival, than that the jury would have thought it plausible that all the government's witnesses were lying and that Luchie had stumbled upon an assault in progress.

The evidence regarding James McMillan perhaps could have led the jury to suspect that he participated in the attack on Fuller, notwithstanding the fact that he was not charged and no eyewitness said he was involved. Alternatively, the jury might have suspected that McMillan arrived on the scene only after Watts and Luchie departed (but before Freeman arrived), and that he and his companion Merkerson looked in the garage—providing an explanation for Luchie's and Freeman's observations of the garage door that did not rely on the supposition that

the assailants were still present when Luchie was there.[81] But we think the jury, even if it had heard from Watts and Luchie, would have had no substantial reason to suspect McMillan was the *sole* perpetrator of Fuller's murder, or that he was one of only a few assailants. Even if he was involved in it, his involvement was entirely consistent with the government's evidence that a large group including Alston, Bennett, and appellants committed the crime; McMillan simply could have been another member of that group. (Indeed, had there been a focus on McMillan at trial, the jury presumably would have learned what the government did to investigate his involvement, and perhaps also that Christopher Taylor had implicated him as a participant in the large group attack.)

Moreover, a theory that McMillan could have been the sole perpetrator of the attack on Fuller, or only one of two or three perpetrators, would have been exceedingly implausible and difficult for the jury to accept—and not only because of the dearth of any evidence inculpating him. To think McMillan could have committed the crime himself, the jury would have had to think not only that all the government witnesses were lying or mistaken about every defendant at trial, but

---

[81] It is not implausible that McMillan heard about the attack and decided to look in out of curiosity; nor that he carried away something from the garage, explaining his suspicious behavior.

that Alston and Bennett, the government's two cooperating witnesses, were innocent even though they had each pleaded guilty to homicide and continued to admit their guilt. That would not have been a plausible claim to make to the jury. It would have been about as daunting for the defense to contend that McMillan committed the crime with just one or two accomplices. Those accomplices would surely have to have been Alston and Bennett (which begs the question of Merkerson's involvement), but if they were going to admit their own guilt and cooperate as part of their plea bargains, there was no apparent reason why they would have shielded McMillan.[82]

---

[82] A far more plausible contention that the attack on Fuller was committed by a small group (one that excluded the defendants on trial) would have been that Alston and Bennett were the sole perpetrators. The government's withholding of evidence did not prevent appellants from raising such a defense at trial. Virtually all the evidence appellants have marshaled against the prosecution's claim of a large group attack—e.g., the expert testimony of Dr. Callery and McCann, Freeman's trial testimony that throughout his day at 8th and H Streets, he never saw a group of young people congregating in the park or engaging in any attack—was available to the defense in 1985. In addition, Alston and Bennett's plea bargains furnished them an identifiable motive to falsely implicate others, and every prosecution witness was vulnerable to impeachment or other challenge on cross-examination in one way or another. Perhaps the testimony of Watts and Luchie would have lent additional support to a theory that Alston and Bennett were the only perpetrators; but for the reasons we have discussed, it would have been slight support at most.

Our conclusion is the same for each appellant individually. Overton and Christopher Turner point to the fact that the jury found it most difficult to convict them. It is true that in some ways the evidence against these two was weaker than that against their co-defendants. Maurice Thomas could not remember whether Christopher Turner was in the alley and affirmatively denied seeing Overton there, and Vincent Gardner did not contradict these two defendants' alibis the way he did those of other defendants. But Overton, Christopher Turner, and the other appellants are similarly situated with respect to the way in which appellants contend the undisclosed evidence regarding the number of assailants and McMillan's possible involvement could have undermined the government's case against them. The evidence either would have provided significant ammunition in support of a single-perpetrator defense or not (and we conclude not). It had no bearing on whether any one individual defendant was part of a large group attack.

This case is not like *Kyles* or *Miller*, the two cases on which appellants principally rely. In those cases, there was no dispute as to how the crime occurred, only a dispute as to the identity of the perpetrator. In each case, the *Brady* violation was based on the suppression of substantial evidence that directly

undercut the prosecution's proof of identity and supported the most plausible third-party perpetrator claim by the defense.[83]

Here, the undisclosed evidence (aside from the inconsequential impeachment evidence) would not have directly contradicted the government's witnesses or shown them to be lying, and it did not tend to show that any given appellant was misidentified.  Rather, what is at issue is the basic structure of how the crime occurred.  This makes the burden on appellants to show materiality quite difficult to overcome, because it requires a reasonable probability that the withheld evidence (in its entirety, and however appellants would have developed it) would have led the jury to doubt *virtually everything* that the government's eyewitnesses said about the crime.  It would be different, for example, if the government had suppressed evidence of the kinds of allegations Alston and Bennett made in their later recantations.  That, if believed, would have given the jury a basis on which to

---

[83] In *Kyles*, the prosecution concealed statements by eyewitnesses to a murder that contradicted their identification of the defendant, and statements by the putative alternative perpetrator (along with other evidence) suggesting he had framed the defendant and was himself guilty of the crime.  *See* 514 U.S. 419, 441-49 (1995).  In *Miller*, where the defendant was charged with assault with intent to kill, timely disclosure of the *Brady* material—an eyewitness's grand jury testimony indicating that the perpetrator of a shooting was left-handed (unlike the defendant)—would have helped the defendant establish the guilt of an alternative suspect.  *Miller v. United States*, 14 A.3d 1094, 1116 (D.C. 2011).

doubt the government's entire case. The same might be true if the government had suppressed credible and admissible evidence directly contradicting the accounts of the crime provided by the eyewitnesses. Here, however, the sum of the undisclosed evidence did not rise to that level of significance. We agree with the motions judge that, even if all that evidence had been disclosed in a timely and appropriate fashion, appellants have not demonstrated a reasonable probability that the result of their trial would have been different. The withheld evidence cannot "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[84]

## IV. Analysis of Appellants' IPA Claims

The IPA[85] allows a convicted person to move for a new trial or vacatur of his conviction at any time "on grounds of actual innocence based on new evidence."[86] "Actual innocence" means "the person did not commit the crime of which he or she was convicted."[87] "New evidence," as relevant here, is evidence that was "not

---

[84] *Kyles*, 514 U.S. at 435.

[85] D.C. Code §§ 22-4131 to 4135 (2012 Repl.).

[86] *Id.* § 22-4135 (a).

[87] *Id.* § 22-4131 (1).

personally known and could not, in the exercise of reasonable diligence, have been personally known to the movant at the time of the trial."[88] In hearing a claim brought under the IPA, the court "may consider any relevant evidence," but must consider, *inter alia*,

> (A) The new evidence; (B) How the new evidence demonstrates actual innocence; (C) Why the new evidence is or is not cumulative or impeaching; [and] (D) If the conviction resulted from a trial, and if the movant asserted a theory of defense inconsistent with the current claim of innocence, the specific reason the movant asserted an inconsistent theory at trial.[89]

A defendant is entitled to a new trial if he can show his actual innocence by a preponderance of the evidence.[90] If he can demonstrate his actual innocence by clear and convincing evidence, the court must vacate the conviction with prejudice.[91]

---

[88] *Id.* § 22-4131 (7)(A).

[89] *Id.* § 22-4135 (g)(1).

[90] *Id.* § 22-4135 (g)(2).

[91] *Id.* § 22-4135 (g)(3).

We review the denial of a motion to vacate a conviction or for a new trial under the IPA for abuse of discretion.[92]  In doing so, "we must give great deference to the trial court's role as the trier of fact on the ultimate issue of 'actual innocence' under the IPA, and thus we apply the clearly erroneous standard of review to the trial judge's rejection of alleged newly discovered evidence offered to prove 'actual innocence.'"[93]

Appellants' claims of actual innocence depend on the credibility of the recantations by four witnesses who testified against them at trial, and in particular on the recantations by Alston and Bennett.  The motions judge concluded that appellants "have not come close to demonstrating actual innocence" because he found the recantations to be "not worthy of belief."  Such a credibility determination, made after the judge had the opportunity to hear the recanting

---

[92]  *Richardson v. United States*, 8 A.3d 1245, 1248 (D.C. 2010); *see also Mitchell v. United States*, 80 A.3d 962, 971 (D.C. 2013) ("To the extent that the statute affords the trial court discretion in its application of the IPA, we review for abuse of discretion.") (quoting *Veney v. United States*, 936 A.2d 811, 822 (D.C. 2007), *as modified*, 936 A.3d 809 (D.C. 2007)).

[93]  *Richardson*, 8 A.3d at 1249 (internal citation omitted); *see also* D.C. Code § 17-305 (2012 Repl.) (setting out the standard of review of bench verdicts).

witnesses' live testimony and observe their demeanor, may be overturned only if "it is wholly unsupported by the evidence."[94]

As the motions judge noted, witness recantations in general are "properly viewed with great suspicion" because they are "very often unreliable and given for suspect motives,"[95] among other reasons. Alston and Bennett's recantations in

---

[94] *Godfrey v. United States*, 454 A.2d 293, 301 (D.C. 1982); *see also Johnson v. United States*, 33 A.3d 361, 371 (D.C. 2011) (Where a motion for a new trial is based on the recantation of a witness, "[i]f the trial court determines that the recantation is not credible, that determination ends the inquiry.") (citation omitted); *Bell v. United States*, 871 A.2d 1199, 1201 (D.C. 2005) (same, under the IPA). This accords with the usual rule in an appeal from a bench trial that "[a]n appellate court will not redetermine the credibility of witnesses where, as here, the trial court had the opportunity to observe their demeanor and form a conclusion." *In re S.G.*, 581 A.2d 771, 775 (D.C. 1990) (quoting *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1328 (8th Cir. 1984)); *accord David v. United States*, 957 A.2d 4, 8 (D.C. 2008) ("This court will not 'substitute its judgment for that of the fact-finder when it comes to assessing the credibility of a witness . . . based on factors that can only be ascertained after observing the witness testify.'") (quoting *Robinson v. United States*, 928 A.2d 717, 727 (D.C. 2007)).

[95] *Dobbert v. Wainwright*, 468 U.S. 1231, 1233-34 (1984); *see also, e.g.*, *Meade v. United States*, 48 A.3d 761, 766 (D.C. 2012) ("It has long been established that recanting affidavits and witnesses are looked upon with the utmost suspicion by the courts.") (quoting *United States v. Kearney*, 682 F.2d 214, 219 (D.C. Cir. 1982); internal quotation marks and brackets omitted); *V.C.B. v. United States*, 37 A.3d 286, 291 (D.C. 2012) ("[C]ourts often view recantations of previous accusatory statements with suspicion or skepticism, in part because witnesses offering recantations are often facing radically different pressures than . . . they were at the time of the initial trial.") (internal citations and quotation marks omitted); *Godfrey*, 454 A.2d at 300 n.26 ("[W]itnesses may recant for numerous reasons that have nothing to do with furthering truth or justice.").

particular were suspect, the judge observed, for to accept them "one must begin by suspending one's disbelief that a person would plead guilty to murder (Alston) and manslaughter and robbery (Bennett) and accept a sentence of many years in prison, all based on lies the police pressured them to tell against themselves and their close friends who, based on those lies, would be convicted and spend the rest of their lives in prison." Beyond that, the judge explained the evidentiary basis for his refusal to credit Alston and Bennett as follows:

> The court had an opportunity to hear their testimony under oath, observe their demeanor, compare it to their demeanor on their videotaped interrogations on November 29, 1984 (Alston), and February 6, 1985 (Bennett), review their trial testimony under oath, and compare their testimony to the testimony of all the other witnesses at trial who placed some or all of the petitioners at the scene. In this context, the current testimony of Alston and Bennett that they were not at 8th and H Streets on October 1, 1984, and that they were forced by the police to say they were there and to name the others who were there is nothing short of preposterous. The scene in the alley on October 1, 1984, was crowded and chaotic. Alston and Bennett may have gotten some facts wrong and may have left certain things out or distorted the truth to minimize their own involvement or to protect others, but the basic facts implicating these petitioners and describing a crime perpetrated by a large group were corroborated by too many other witnesses not to be believed. The notion that Alston and Bennett were not present and made it all up cannot be credited when juxtaposed with their videotaped statements, their guilty pleas, Alston's admissions to other witnesses, Alston's trial testimony and Bennett's grand jury and trial testimony. Both witnesses were

extensively cross examined at trial by ten seasoned defense counsel over the course of several days about the many discrepancies and inconsistencies in their respective versions of events. It is exceedingly unlikely that any juror would have concluded that Alston and Bennett were not on the scene or that they were not accurately reporting at least most of what they saw, heard, and did that day. Their motives for now coming forward cannot be known. Both are now out of prison and no longer seeking release from the parole board, where their current lack of remorse might be held against them. Back in their communities, perhaps even this many years later they are still burdened with guilt from having benefitted themselves by sending their friends to prison. Whatever their current motivation may be, the court does not credit their recantations, and their attempt at exculpation does not help the petitioners meet their burden of proving actual innocence.

In short, the judge evaluated the recantations of Alston and Bennett in light of the entire evidentiary record, taking into account their demeanor both on the witness stand and during their allegedly coerced confessions, and weighing their recantations against their previous sworn testimony and other evidence of their guilt and petitioners' guilt.[96] We have no basis on which to overturn the judge's finding that the recantations were incredible.

---

[96] It should be noted that the judge credited the detectives and prosecutors who denied having coerced witness testimony. In that connection, the judge did not ignore the expert opinion testimony of Dr. Leo. But as the judge pointed out, the most this expert testimony could show was that the interrogators in this case employed techniques that heightened the risk of a false confession; it did not establish that the confessions were false.

We also perceive no error in the judge's finding that the purported recantations of Montgomery and Jacobs were worthless. We need not belabor this point. As to Jacobs, the judge fairly concluded that her recantation was unreliable because it "did not indicate with any specificity or clarity just which parts of her prior account were untrue."[97] As for Montgomery, who disavowed his recanting affidavit and reaffirmed the truth of his trial testimony, the judge certainly did not err in concluding that his testimony at the 2012 hearing lent no support to petitioners' IPA claim.

Without the discredited recantations, appellants' remaining new evidence was clearly not enough to overcome the government's proof of their guilt and show their actual innocence by a preponderance of the evidence, let alone by clear and convincing evidence. Appellants argued that the "unrebutted scientific evidence," i.e., the expert opinion testimony of Dr. Callery and McCann, showed them to be innocent. We agree with the motions judge that this does not qualify as "new evidence" under the IPA, because appellants, in the exercise of reasonable

---

[97] *Meade*, 48 A.3d at 767. In addition to insisting that she lied about the petitioners at trial but did not remember anything she said, Jacobs also testified that she never went into the alley where Fuller was attacked. The judge found it striking, however, that "whenever [Jacobs] was asked if she saw any of the attack or the act of sodomy against Mrs. Fuller, Ms. Jacobs broke down sobbing just the way she did when she was confronted with that visual image at trial."

diligence, could have presented such testimony at their trial.[98]  But even assuming

otherwise, the motions judge had ample reason to discount the expert testimony

proffered by appellants, for as he explained,

> neither Dr. Callery nor Mr. McCann could definitively state that Mrs. Fuller was attacked by one to three individuals as opposed to a larger group.  While both testified that, in their opinion, it was more likely that a small number of individuals inflicted the injuries on Mrs. Fuller, both admitted that it was possible that a greater number of persons were involved.[99]  Given the court's rejection of the recantations and the other trial evidence pointing to an attack by ten or more assailants, petitioners' "unrebutted scientific evidence," even if it were new, is not particularly persuasive and does not begin to demonstrate that the petitioners are "actually innocent."

Finally, McMillan's horrific murder of A.M. in 1992 may tend to make it

more likely that he was involved in the attack on Fuller eight years earlier.

Nevertheless, we agree with the motions judge that "these two brutal murders

could not be characterized as signature crimes," and that "[w]hatever may be said

of the similarities between the two crimes, they certainly do not prove that James

---

[98] *See* D.C. Code § 22-4131 (7); *Bouknight v. United States*, 867 A.2d 245, 254-56 (D.C. 2005).

[99] Moreover, the medical examiner who testified in 1985 concluded that he could not say with specificity how many people attacked Fuller, a conclusion with which Dr. Callery agreed.

McMillan murdered Mrs. Fuller to the exclusion of [appellants], when all of the credible evidence points the other way."

### V. Yarborough's Claim of Ineffective Assistance of Counsel

In the videotaped statement he gave following his arrest, appellant Yarborough admitted having been present at the alley and witnessing appellants' attack against Fuller, though he denied participating in the attack himself. Yarborough's motion to suppress the videotaped statement as involuntary was denied, and the statement was introduced in evidence against him at trial. In his § 23-110 motion, Yarborough claimed that his trial counsel pursued suppression of his statement ineffectively, in violation of his duties to Yarborough under the Sixth Amendment, because he neglected to investigate Yarborough's mental disabilities and rely on them as additional grounds for finding the statement involuntary. In rejecting this claim, the motions judge concluded that Yarborough failed to show either that his counsel's performance was deficient or that the alleged deficiency prejudiced him at trial. We find it unnecessary to reach the question of deficient performance, because we agree with the motions judge that Yarborough has not carried his burden of showing the requisite likelihood of prejudice.

## A. Background

### 1. Yarborough's Statements to Police

On October 4, 1984, three days after Fuller's murder, Yarborough was interviewed as a witness to the incident by Detectives McGinnis and Sanchez. Their questions and Yarborough's answers were recorded in an eight-page typewritten statement.[100] In this initial interview, Yarborough told the detectives he was present at 8th and H Streets when a number of his friends (including several of the appellants here) decided to rob a lady crossing the street there. Yarborough said he did not join them or participate in the attack, but he watched the others follow the lady to the alley. He said he walked away after hearing the lady's screams.

Yarborough was not arrested until the morning of December 9, 1984. On that occasion, he again waived his *Miranda* rights and agreed to be questioned by Detectives McGinnis and Sanchez. His interrogation culminated in an hour-long

---

[100] At the outset, Yarborough acknowledged understanding that he was not under arrest and was free to leave at any time, and he waived his *Miranda* rights. When asked whether he could read and write, Yarborough answered, "I can write but I can't read real good." Yarborough then was asked whether he would like Detective Sanchez to read his statement over to him, and he requested this be done. Yarborough proceeded to sign every page of the statement and initial every one of his answers.

videotaped statement.  At the outset of that statement, Yarborough confirmed that he understood and had waived his Fifth Amendment rights in writing, that no promises had been made to him in return for his statement, and that no force had been used against him.[101]  Then, beginning with McGinnis's open-ended request to "tell us everything you know about" the death of Fuller, Yarborough described how he saw appellants and others attack, rob, hit, and stomp Fuller in the alley at 8th and H Streets, sodomize her with a pole just outside the garage, and then drag her into the garage there.  Although Yarborough continued to deny having participated in this attack in any way (which was contrary to other evidence the police had obtained since his earlier interview), he now admitted his presence at the scene from start to finish.  A version of Yarborough's videotaped statement, redacted to eliminate his identification of several of his co-defendants, was admitted in evidence against him at trial and played for the jury.

## 2. Yarborough's Suppression Motion

Prior to trial, Yarborough moved to suppress his videotaped statement.  His sole contention at the suppression hearing was that the detectives had employed

---

[101] McGinnis asked Yarborough if he was injured.  Yarborough said, "not really," and went on to explain that he had a "bad leg" from an injury he had received before that day.

threats and physical abuse to coerce him into waiving his rights and admitting he was present when Fuller was murdered. The detectives denied it. Yarborough's only evidence of mistreatment—he did not take the stand and testify to it—was the fact that, after his statement was videotaped, the police took him to the hospital, where he was treated for pain and swelling in his left knee and released. The hospital records reflected that Yarborough reported his leg had been injured in the course of his arrest. In his videotaped statement, however, Yarborough said he had hurt his leg sometime before he was arrested, and Detective McGinnis testified that Yarborough told him he had injured his knee playing sports. After taking this evidence and viewing the videotape, the trial judge found that Yarborough did not sustain his knee injury during his interrogation, that his claims of abuse were unsubstantiated, and that he voluntarily waived his *Miranda* rights.

On direct appeal, Yarborough argued that the trial judge erred in denying his motion without taking into consideration "his age, education, and experience with the criminal justice system."[102] Because Yarborough had presented no evidence with respect to those factors, we held that the trial court "properly based its decision upon the important factors brought to its attention," and that "[u]nder the

---

[102] *Catlett v. United States*, 545 A.2d 1202, 1207 (D.C. 1988).

totality of the circumstances, the trial court's conclusion had substantial support in the evidence."[103]  We affirmed the denial of Yarborough's motion to suppress.

### 3. The Hearing on Yarborough's Ineffective Assistance Claim

Yarborough took the stand for the first time at the 2012 hearing on appellants' post-conviction motions.  He did so in part to present evidence relevant to his ineffective assistance of counsel claim (namely, that he took special education classes in junior high and high school and could not read well), but principally to assert his innocence and reiterate, this time in his own words, his previous claim that the detectives coerced him by means of physical violence and threats of violence into waiving his rights and falsely incriminating himself.  Contradicting the statements he gave to the police on October 4 and December 9, 1984 (and other evidence adduced at trial), Yarborough asserted that he spent the afternoon and evening of October 1, 1984, at his girlfriend's house, was not at 8th and H Streets when Fuller was attacked, and did not witness the crime at all.[104]

---

[103] *Id.* at 1209.

[104] Yarborough's girlfriend at the time, Chandera Hill, corroborated his alibi but was impeached with her 1985 grand jury testimony that she did not remember what she or Yarborough were doing on the day of the murder.

Yarborough claimed that the eight-page question-and-answer statement of October 4 was a total sham: The police, he said, wrote it in advance of his interview without his knowledge, and Detective McGinnis directed him to initial virtually every line and sign every page while covering it with his hand to prevent Yarborough from reading it.

As to the December 9 videotaped statement, Yarborough claimed it was the product of extensive physical abuse by Detective Sanchez, threats of violence by both detectives, and prolonged coaching by McGinnis. Yarborough testified that before the videotaping, in response to his initial refusal to waive his *Miranda* rights, Sanchez threw him across the table, screamed that he could not write "no" on the waiver form, and then slammed him back into his chair. Only then, Yarborough said, did he agree to waive his rights. Next, Yarborough testified, after he insisted he knew nothing about Fuller's murder, Sanchez threw him around the room and into a filing cabinet (allegedly injuring his left knee), dragged him to a bathroom and flushed his by now bloodied head in the toilet bowl. At one point, the detective dramatically ripped off his own t-shirt and threatened to kill Yarborough if he did not confess. McGinnis allegedly warned Yarborough that Sanchez had killed two other people for lying, expressed the hope that Yarborough would not be the third, and read him several statements about the attack on Fuller

to instruct him what he needed to say. During the videotaping that followed this abusive treatment, Yarborough testified, Sanchez menacingly held a slapjack in his hand to keep him in line while McGinnis signaled to him with his eyes to guide his testimony and help him avoid straying from the script. (The videotape does not reveal any such behavior on the part of either detective, or any signs that Yarborough had been mistreated or injured.)

What he said on tape about the crime, Yarborough testified, came in part from what McGinnis told him to say (off-camera, just before the videotaping commenced), and in part from his own imagination. Because he did not admit to having participated in the robbery and assault of Fuller, Yarborough expected to be released after the videotaping.[105]

Both detectives testified at the hearing and contradicted Yarborough's account of his interrogations. They denied ever physically abusing Yarborough or threatening him in any way, telling him he could not invoke his rights, feeding him information, or directing him what to say or sign. The detectives averred that

---

[105] He remained in custody, however, and was taken to the hospital for his leg injury. He testified that he told hospital personnel that the police had beaten him.

Yarborough himself provided the information in his eight-page statement on October 4; McGinnis described Yarborough as being able to understand and answer their questions in a responsive, "cogent" manner. The detectives acknowledged that on December 9, when they questioned Yarborough after he waived his rights and before he agreed to give a videotaped statement, they sometimes yelled at him, accused him of lying, and told him he would be better off if he would just tell the truth. They admitted playing a "good cop/bad cop" routine in which Sanchez pretended to be enraged, McGinnis ushered him out of the room, and Sanchez then banged on the door, demanding to be let back in. At one point, Sanchez either pretended to or actually did tear off his t-shirt for dramatic effect. But Yarborough did not appear to be intimidated by these tactics. He continued to deny any personal involvement in the attack on Fuller, and he adhered to certain details of his story that the detectives questioned (notably, whether he received money taken from Fuller, which Yarborough firmly denied).

Two witnesses at the 2012 hearing testified in support of Yarborough's claim that an investigation by his trial counsel of his cognitive impairments would have yielded support for a motion to suppress his videotaped statement on voluntariness grounds. First, Dr. Michael O'Connell, a forensic psychologist, testified that Yarborough had an adjusted full scale I.Q. score of 69.5, placing him

at the high end of the range for mild mental retardation, and that Yarborough's low scores on the Gudjonsson Suggestibility Scales indicated he was more suggestible than 99% of the population.[106]  Dr. O'Connell opined that a person with these characteristics would struggle in an interrogation setting because he would tend to overemphasize short-term benefits at the expense of long-term consequences and be acquiescent and eager to please his interrogators.[107]

Second, Chandera Hill (Yarborough's girlfriend in 1984) testified that she regularly helped Yarborough with his homework, often doing it for him because he had trouble with reading, comprehension, and pronunciation.[108]  She also testified that Yarborough's trial counsel spoke to her but never asked her about Yarborough's I.Q., comprehension, reading, or homework abilities.

In rejecting Yarborough's ineffective assistance claim, and concluding that evidence of his mental impairments would not have changed the outcome of the

---

[106] There also was documentary evidence, referenced in Yarborough's presentencing report, that a psychological evaluation performed in May 1984 found Yarborough to be "functioning intellectually in the mentally deficient to borderline range."

[107] Yarborough "didn't do badly," however, on a test to determine whether he understood his *Miranda* rights.

[108] Yarborough was sixteen years old in 1984.

motion to suppress his videotaped statement, the motions judge found, *inter alia*, that Yarborough's testimony at the hearing was "patently incredible," and that the evidence did not "bear out any of [his] extraordinary claims" of physical abuse, threats, and other misconduct by the detectives who obtained his statements.[109] The judge credited the detectives' testimony to the contrary. In addition, and "most importantly," the judge found that

> [Yarborough's] demeanor on the videotape of his interrogation shows him to be entirely relaxed, spontaneous, and in no distress. Many of the things Yarborough said on the videotape seem unlikely when compared with other evidence, but there is no indication that the facts he chose to include came from the police or from any source other than him. For example, when the detectives tried to get him to admit that he received money that was part of the proceeds of the robbery of Mrs. Fuller, he adamantly insisted that the two dollars he received from petitioner Catlett was a loan that came from other money Catlett had in his pocket, not from the proceeds of the robbery.

In sum, the judge found that Yarborough's videotaped statement

> was not the statement of a helpless mentally vulnerable young man being fed facts by the police and parroting them back to please his interrogators; it was the voluntary admission of a conniving youthful offender trying to distance himself as far as possible from the crime while

---

[109] Yarborough does not challenge these factual findings on appeal.

not denying that he was there . . . . No amount of psychological testing or social science research was likely to convince the court that this false exculpatory statement should be suppressed, particularly where the judge did not believe the defendant's claim about physical coercion in the first place.

## B. Analysis

A claim of ineffective assistance of counsel has two components:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.[110]

The performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.[111] On appeal, we accept the motions judge's findings of fact unless they lack evidentiary support, and we review the judge's legal conclusions *de novo*.[112]

---

[110] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[111] *Id.* at 698.

[112] *Cosio v. United States*, 927 A.2d 1106, 1123 (D.C. 2007) (en banc).

As the Supreme Court has said, "there is no reason" for an appellate court to address both components of the ineffectiveness inquiry if it determines that the defendant has made an insufficient showing on one of them. "In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."[113]   We think it appropriate to confine our discussion here to the prejudice component of Yarborough's claim. We therefore shall assume, without deciding, that trial counsel performed deficiently in failing to investigate and learn of Yarborough's mental limitations in anticipation of moving to suppress his videotaped statement as involuntary.[114]   The question then is whether it is likely that this failure of investigation was prejudicial to Yarborough.

To satisfy the prejudice component of the ineffectiveness inquiry, a defendant's burden is to show "a reasonable probability that, but for counsel's

---

[113] *Strickland*, 466 U.S. at 697.

[114] It should be noted that Yarborough's claim is that his statement was involuntary, not that he lacked the necessary understanding to waive his Fifth Amendment rights knowingly and intelligently.

unprofessional errors, the result of the proceeding would have been different."[115] In this case, that necessary showing has multiple steps. First, Yarborough must show a reasonable probability that a competent attorney, having investigated and become aware of his intellectual limitations and susceptibility to police pressure and suggestion, would have relied on those facts as a basis for moving to suppress his videotaped statement as involuntary.[116] Second, Yarborough must show that it is reasonably probable the trial court would have granted a motion to suppress based on this theory.[117] And third, Yarborough also must show a reasonable probability that the jury's verdict would have been different—that the jury would have acquitted him on at least some counts—had his statement been suppressed.[118]

---

[115] *Strickland*, 466 U.S. at 694.

[116] *See Cosio*, 927 A.2d at 1132.

[117] *Howerton v. United States*, 964 A.2d 1282, 1290 (D.C. 2009) (citing *Taylor v. United States*, 603 A.2d 451, 459 (D.C. 1992)).

[118] *See Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986) (holding that where a claim of ineffectiveness is predicated on defense counsel's failure to litigate an evidence suppression motion competently, the defendant must prove that the motion "is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice").

We shall focus on the first two of these steps.[119]

At the pretrial suppression hearing, the government bore the burden of proving that Yarborough's videotaped statement was voluntary by a preponderance of the evidence.[120] "The test for determining the voluntariness of specific statements is whether, under the totality of the circumstances, the will of the suspect was overborne in such a way as to render his confession the product of coercion."[121] The presence of official compulsion—"coercive police activity" or "police overreaching"—is "a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause."[122] That said, "[i]n determining whether a defendant's will was over-borne in a particular case, the

---

[119] We think Yarborough has made the showing required in the third step, a reasonable probability that the jury would have acquitted him had it not had his videotaped statement to consider. The evidence introduced at trial of Yarborough's complicity in the attack on Fuller without that statement was not overwhelming. Although Alston and Thomas implicated him in the attack, Bennett testified that Yarborough remained in the park when the group accosted Mrs. Fuller, and Montgomery only remembered seeing Yarborough there after the murder, not before. The importance of Yarborough's videotaped statement is suggested by the fact that it was the last thing the jury asked to see before returning its first round of verdicts, in which it found Yarborough guilty.

[120] *Graham v. United States*, 950 A.2d 717, 735 (D.C. 2008) (citing, *inter alia*, *Lego v. Twomey*, 404 U.S. 477, 484 (1972)).

[121] *Id.* at 735-36 (internal quotation marks and brackets omitted).

[122] *Id.* at 736 (quoting *Colorado v. Connelly*, 479 U.S. 157, 166-67 (1986)).

Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation."[123]  Relevant personal characteristics include "the suspect's age, education, prior experience with the law, and physical and mental condition"; "relevant details of the interrogation include its duration and intensity, the use of physical punishment, threats or trickery, and whether the suspect was advised of his rights."[124]

Because Yarborough's intellectual limitations and suggestibility could have impaired his effective assertion of his rights and rendered him vulnerable to police coercion, they unquestionably were relevant to the voluntariness inquiry in this case.  But that is not the end of the inquiry[125]; despite Yarborough's cognitive

---

[123] *Id.* at 736 (quoting *Schneckloth v. Bustamonte*. 412 U.S. 218, 226 (1973)).

[124] *Id.*; *see also, e.g.*, *In re M.A.C.*, 761 A.2d 32, 36 (D.C. 2000) (recognizing that where "young persons" are involved, the factors bearing on voluntariness include "the juvenile's age, experience, education, background and intelligence, the circumstances under which the statement was given, and whether the juvenile 'has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights,'" as well as any "evidence of physical abuse, the length of the detention, the use of trickery, mental or emotional stability, mental capacity, and physical illness or injury") (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

[125] *Cf. In re M.A.C.*, 761 A.2d at 38-39 (upholding determination that mildly mentally retarded fifteen-year-old's confession was voluntary; "[a] low I.Q., standing alone, will not render an otherwise voluntary and knowing confession

*(continued…)*

weaknesses, there is insufficient evidence to show a reasonable probability that he actually was coerced into waiving his rights and providing the statement used against him.  The evidence is to the contrary.

First, the contention that Yarborough's videotaped statement was the product of his intellectual limitations and consequent vulnerability to police suggestion is flatly inconsistent with Yarborough's own testimony at the 2012 hearing and what he apparently told his trial counsel in 1985—that the detectives coerced him into waiving his rights and making a false statement against his will by force and violence.  This assertion by Yarborough means that his putative vulnerability to police suggestion had nothing to do with his waiver and statement.  Indeed, so far as appears, Yarborough has never maintained that his statement and incriminating admissions were the product of undue suggestion or trickery by his interrogators, or of his own suggestibility, confusion, naïve desire to please the police, inability to appreciate the gravity of his situation, or the like.  As the motions judge observed in his decision, Yarborough claimed "the police beat the

---

*(continued…)*
inadmissible. . . .  [t]he youth's intelligence, as measured by testing, is only one of many factors for consideration"); *Robinson v. United States*, 928 A.2d 717, 725-27 (D.C. 2007) (holding videotaped confession voluntary notwithstanding defendant's mild mental retardation).

statement out of him under circumstances that would have caused the strong as well as the weak to succumb to the pressure." This is devastating to Yarborough's alternative claim that his intellectual limitations could have persuaded the trial court to suppress his statement as involuntary, since it means the argument would have been vitiated and frustrated by Yarborough's inability to support it with his own testimony.

In addition, the other evidence in its totality refutes the claim that the detectives took advantage of Yarborough's low intelligence and suggestibility to coerce his videotaped statement. That hour-long exchange with the detectives is itself compelling evidence otherwise. Whatever pressure Yarborough was under to confess his participation in the attack on Fuller, he did not yield to it.[126] Nor was he notably compliant in other respects. As the motions judge pointed out, Yarborough did not acquiesce in the detectives' effort to get him to admit that he received some of Fuller's money from appellant Catlett after the murder. That a number of other details Yarborough provided about the assault were contrary to what the police had learned from other sources further undercuts the claim that

---

[126] Indeed, that Yarborough professes to have believed he was going to be released after the videotaping because he had not admitted participating in the attack provides additional reason to conclude his statement was voluntary.

Yarborough was induced to spout what the detectives wanted to hear even though he did not know it to be true. In point of fact, Yarborough's serious cognitive limitations themselves make it hard to credit the idea that his videotaped statement was the product of a rehearsal in which he learned the lines the detectives fed him; one would think the degree of concentration and memory required for that to succeed would have been beyond his mental capabilities.

There is no indication of coercion or lack of voluntariness on the videotape. It can be seen that Yarborough is not handcuffed. He sits at a table, facing the two detectives. He has a can of soda to drink. The motions judge accurately described his demeanor as relaxed, spontaneous, and evincing no sign of distress or discomfort. Yarborough does not appear to be injured or tired. He was not deprived of sleep, nor had he been in custody for more than a few hours. He had been advised, repeatedly, of his *Miranda* rights, and he had agreed to waive them. There is no reason to doubt that he adequately understood his rights and what it meant to waive them.

In short, due to his intellectual limitations, Yarborough may have been highly suggestible, compliant, and prone to making faulty judgments about his own best interests—but that does not mean the police obtained his videotaped statement

by taking advantage of those vulnerabilities. The evidence to the contrary convinces us that there is no reasonable probability that a motion to suppress his statement as involuntary based on his intellectual limitations would have succeeded, or that competent counsel aware of Yarborough's mental disabilities would have thought such a motion worth pursuing under the circumstances of this case. We therefore hold that Yarborough has not shown the necessary prejudice from his trial counsel's failure to investigate his mental limitations to prevail on his claim of ineffective assistance of counsel.

## VI. Conclusion

For the foregoing reasons, we affirm the order of the Superior Court denying appellants' motions for relief from their convictions under D.C. Code §§ 22-4135 and 23-110.

*So ordered.*